**SOLUTIONEERS CONSULTING, LTD., Tom Haynes, and T & S Haynes Enterprises, LLC D/B/A Mission Control, Appellants,**

v.

**GULF GREYHOUND PARTNERS, LTD., Appellee.**

No. 14–06–00032–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 23, 2007.

Rehearing Overruled Oct. 18, 2007.

R. Allen Ashcraft, Jr., Kenneth C. Baker, Houston, for appellants.

George W. Vie, III, Jack C. Brock, Robert Edward Booth, Galveston, for appellee.

Panel consists of Justices YATES, FROST, and SEYMORE.

## OPINION

LESLIE B. YATES, Justice.

In four issues, appellants Solutioneers Consulting, Ltd. ("Solutioneers"), Tom Haynes, and T & S Haynes Enterprises, LLC d/b/a Mission Control ("Mission Control") challenge the sufficiency of the evidence supporting the jury's findings in favor of Gulf Greyhound Partners, Ltd. ("GGP") for fraud and breach of contract. We affirm in part and reverse and render in part.

## I. BACKGROUND

This appeal involves a series of transactions between Haynes, his two advertising companies, Mission Control[1] and Solutioneers, and the companies' client, GGP, which operates a racetrack in Galveston County, Texas. Haynes owns and serves as general partner of Mission Control, an advertising agency that purchases advertising time from various media outlets for clients. Haynes also owns Solutioneers, an advertising company whose business consists largely of obtaining corporate sponsorships for clients. As described in further detail below, GGP entered into independent agreements with Mission Control and Solutioneers to obtain advertising for and sponsorship of its racetrack operations, and events relating to these agreements gave rise to the causes of action in this appeal.

### A. Mission Control

In December 1999, GGP and Mission Control entered into an agency contract in which Mission Control[2] agreed, as agent of record, to purchase advertising time on GGP's behalf in return for commissions. Charlie Fenwick, GGP's director of marketing, testified that GGP enlisted Mission Control to alleviate the burden of conducting marketing operations in-house, which requires constant communication with media outlets and a large volume of paperwork. Under the agreement, Mission Control would purchase advertising time[3] for GGP as follows: (1) Mission Control would select and agree to purchase time from a media outlet, (2) the outlet would send an invoice to Mission Control reflecting the amount due for the time, (3) Mission Control would forward a "master" invoice to GGP, which included the amount due for the time plus Mission Control's commission, (4) GGP would pay Mission Control the entire amount on the master invoice within ten to fourteen days of receipt, and (5) Mission Control would de-

1. T & S Haynes Enterprises, LLC, a named appellee, is the parent company of Mission Control.

2. Mission Control entered into the contract under its former name, Haynes Media & Marketing, but the parties do not dispute that the contract fully applies to Mission Control.

3. Mission Control obtained two types of advertising time for GGP—"network" and "non-network." Network time included time Mission Control had previously purchased through contracts with media outlets and would then resell to GGP. Non-network time included time Mission Control sought out and purchased on behalf of GGP, and, as compensation for obtaining non-network time, Mission Control received a fifteen percent commission. Because non-network time represents the focus of this appeal, unless otherwise specified, all references to advertising time and related debt refer to non-network time and debt.

duct amounts for its commission and then forward the difference to the outlet as payment for the time. According to Fenwick, GGP expected Mission Control to forward payment to the media outlet immediately upon receipt of payment from GGP.

As early as January 2001, GGP began receiving calls from media outlets complaining that GGP had not paid invoices for advertising time Mission Control had purchased. Fenwick contacted Haynes about the complaints; Haynes assured Fenwick the invoices had been paid, that the outlets were mistaken, and that his employees would investigate the situation. Fenwick testified that after these initial complaints, the problem went away, as GGP did not hear anything further from the media outlet or Haynes, and GGP continued to pay invoices based on Haynes's assurances. However, as the year progressed, GGP received similar phone calls from a growing number of outlets. Eventually, in June 2001, after GGP made further inquiries about the situation, Haynes set up a meeting with Fenwick. At the meeting, Haynes and his employee, Aldie Beard, disclosed that Mission Control failed to forward $154,000[4] to media outlets for time that Mission Control had placed for GGP, producing detailed documentation of the delinquent accounts. Haynes admitted he used these funds to pay off debts to other media outlets because his "businesses" were experiencing financial difficulty.

Thereafter, Fenwick, Barry Sevedge, who is Fenwick's boss and GGP's general manager, and another representative in GGP's corporate office held several meetings amongst themselves and with Haynes

to determine the most efficient method to resolve the outstanding debt while salvaging GGP's business reputation. As a result of these meetings, GGP directed the media outlets to send all future invoices directly to GGP and stated that GGP would now pay them directly. Further, Haynes agreed to help GGP negotiate with the outlets to either release or reduce the outstanding debt in return for promises of future advertising purchases from GGP, and the parties agreed Mission Control would still receive commissions on future business it obtained in these negotiations. GGP decided not to sever ties and pursue legal action against Haynes and Mission Control immediately because Haynes, who enjoyed closer, long-term relationships with many of the media outlets and had more information regarding the accounts in default, could serve as an intermediary and more effectively negotiate down the debt than could GGP alone.

Although GGP and Haynes successfully obtained debt releases from most of the media outlets by promising future business, some outlets refused, leaving $56,000 in unreleased debt. Therefore, to avoid damage to its credit, GGP paid $56,000 to these remaining outlets, which GGP considered a "double" payment in that it had once already transmitted funds to Mission Control to purchase this time. Sevedge testified that he considered the $56,000 double payment a loan to Mission Control and that GGP never released Mission Control from liability for repayment, though he explained that he and Haynes failed to negotiate a firm schedule for repayment, despite repeated attempts. Sevedge further noted that, in addition to repaying the $56,000, GGP initially paid Haynes and

---

4. Some portions of the record reflect $164,000 as the amount of non-network debt. Because the parties do not dispute the particular numerical value of the final damage award as to Mission Control and Haynes, which was extrapolated from the non-network debt figure, we need not address this discrepancy.

his employees commissions in excess of that originally agreed, in the hope that Mission Control could continue business and would become able to repay the loan in the future. Haynes, on the other hand, understood that Mission Control had no obligation to repay the $56,000, claiming Sevedge told him it was a "cost of doing business." On July 10, 2002, after repeated failures to settle on a repayment schedule, GGP terminated its relationship with Haynes and his companies, including Mission Control. Mission Control never repaid the $56,000.

## B. Solutioneers

In February 2001, before GGP fully learned of Mission Control's failure to pay the media outlets, GGP entered into a contract with Solutioneers in which Solutioneers agreed to obtain sponsorships for the racetrack in return for commissions. Under the agreement, Solutioneers would receive commissions both for obtaining new sponsorships and for enhancing the value of existing sponsorships. As with the original Mission Control agreement, the contract provided that Solutioneers would collect payments directly from the sponsors and remit GGP's share within seven days of receipt.

Thereafter, Solutioneers, through negotiations conducted by Haynes, enhanced the value of an existing sponsorship agreement GGP held with Miller Brewing Company ("Miller") from $50,000 to $75,000 per year for a two-year period. In 2002, Miller made the yearly payment in two equal installments of $37,500, one in the spring and one in the fall. Solutioneers received the spring payment on May 29, 2002, but failed to remit to GGP its share until July 5, 2002. Fenwick testified that, when confronted about the late payment, Haynes lied about whether he had received or deposited the spring payment from Miller.

Solutioneers received the fall payment on August 14, 2002, but never forwarded any portion of this payment to GGP. The record does not reveal what Solutioneers or Haynes did with these funds.

## C. Procedural History

GGP thereafter filed suit against Mission Control, Solutioneers, and Haynes. GGP alleged Mission Control had, based on its failures to forward payments to media outlets for advertising time it placed and related misrepresentations and omissions, breached its contract and committed fraud by misrepresentation and omission. GGP also claimed Haynes individually committed fraud by misrepresentation for such conduct. GGP additionally alleged that Solutioneers breached its contract in failing to remit GGP's share of the first Miller sponsorship payment within seven days of receipt and withholding the entire second payment. GGP also generally pleaded that Mission Control and Solutioneers constituted alter egos of Haynes and thus the companies' corporate veils should be pierced to hold Haynes personally liable. Mission Control, Solutioneers, and Haynes generally denied and asserted various affirmative defenses, including ratification, waiver, and unclean hands. Mission Control counterclaimed for breach of contract, alleging GGP failed to pay over $66,000 in commissions for advertising time it placed from April 2002 to July 2002.

At trial, the jury made the following findings: (1) Mission Control committed fraud by misrepresentation and by omission, (2) Haynes committed fraud by misrepresentation, (3) Mission Control breached its contract with GGP, which was not excused due to unclean hands or otherwise, (4) GGP also breached the contract, but was excused, (5) Solutioneers breached its contract with GGP, and (6) Haynes was

responsible for the conduct of both Mission Control and Solutioneers under an alter ego theory. For each instance of fraud by Mission Control and Haynes, the jury awarded $56,000 in damages for the "difference, if any, in the value of the agency services received and the price [GGP] paid." For Mission Control's breach of contract, the jury awarded $56,000 in damages for the "difference between the value of the radio ads as represented and the value received." For Solutioneers's breach of contract, the jury awarded $52,237.50, the amount of sponsorship payments Solutioneers failed to remit to GGP.

The trial court entered judgment on the verdict. The court awarded recovery against Haynes and Mission Control, jointly and severally, for $56,000 based on the jury's findings of fraud and breach of contract. The court further awarded recovery against Solutioneers and Haynes, jointly and severally, for the breach-of-contract damages. The court additionally awarded recovery against Mission Control and Solutioneers, jointly and severally, for $75,000 in attorney's fees. The court subsequently denied appellants' motions for new trial and for judgment notwithstanding the verdict.

On appeal, appellants challenge the sufficiency of the evidence supporting the jury's findings of fraud, alter ego, and excuse for breach of contract.

## II. Analysis

In a legal sufficiency or no-evidence review, we determine whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). In conducting this review, we credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not.

*Id.* We must consider the evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. *Id.* at 822. We must, and may only, sustain no-evidence points when either the record reveals a complete absence of evidence of a vital fact, the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, the evidence offered to prove a vital fact is no more than a mere scintilla, or the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. Evidence is no more than a scintilla when it is so weak as to do no more than create a mere surmise or suspicion of its existence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *See Wilson*, 168 S.W.3d at 819. We conduct our review in light of the charge as submitted to the jury. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.2000).

In a factual sufficiency review, we consider all the evidence supporting and contradicting the finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We set aside the verdict only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). As with a legal sufficiency review, we conduct our analysis in light of the jury charge. *See Osterberg*, 12 S.W.3d at 55.

### A. Fraud: Mission Control and Haynes

In issues one and two, Mission Control and Haynes contend the evidence is both legally and factually insufficient to support the jury's findings of fraud by misrepre-

sentation and omission.[5] Mission Control and Haynes do not dispute that, upon receipt from GGP, they failed to forward payments for advertising time to the appropriate media outlets. They argue, rather, that since GGP made the $56,000 double payment after they disclosed the failure to pay, such expenditure did not result from any misrepresentation or omission by Mission Control or Haynes, but rather was made with "eyes wide open."

■ To recover on an action for fraud, a party must prove that (1) a material representation was made, (2) the representation was false, (3) when the speaker made the representation, he knew it was false or made it recklessly without knowledge of the truth as a positive assertion, (4) the speaker made it with the intention that it should be acted upon by the party, (5) the party acted in reliance upon it, and (6) the party thereby suffered injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998); *Manon v. Solis*, 142 S.W.3d 380, 387 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). Fraud by omission is a subcategory of fraud because an omission or non-disclosure may be as misleading as a positive misrepresentation of fact when a party has a duty to disclose. *See Manon*, 142 S.W.3d at 387. Thus, failure to disclose information does not generally constitute fraud unless there is a duty to disclose the information. *See Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex.2001). The duty to disclose may arise (1) when the parties have a confidential or fiduciary relationship, (2) when one party voluntarily

discloses information, which gives rise to the duty to disclose the whole truth, (3) when one party makes a representation, which gives rise to the duty to disclose new information that the party is aware makes the earlier representation misleading or untrue, or (4) when one party makes a partial disclosure and conveys a false impression, which gives rise to the duty to speak. *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998); *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*, 217 S.W.3d 653, 670–71 (Tex. App.-Houston [14th Dist.] 2006, pet. filed).

■ Based on our review of the record, we conclude the evidence is both legally and factually sufficient to support the findings of fraud as to Haynes and Mission Control. First, the evidence shows that Haynes, acting for Mission Control, made false, material misrepresentations to GGP and that Mission Control failed to execute its duty to disclose information. When GGP asked Haynes about complaints from media outlets concerning delinquent payments for advertising time, Haynes assured GGP that Mission Control had paid the outlets and that the outlets were mistaken, but Haynes later disclosed to Mission Control that it in fact had not paid numerous media outlets. Further, as an agent of record and thus fiduciary for GGP, Mission Control at least had a duty to disclose information pertaining to its inability to pay its bills and its appropriation of GGP's funds to pay such bills. *See Four Bros. Boat Works*, 217 S.W.3d at 668 (noting that principal-agent relationship constitutes formal fiduciary relationship

---

5. GGP notes Haynes contended to the trial court that, although statements "regarding performance or payment ... [were] technically verbalized through [Haynes], [these] statements were made on behalf of [Mission Control]." Haynes does not renew this contention on appeal, but, in any event, we note that corporate agents may be individually lia-

ble for fraudulent acts committed while in the service of their corporation. *See Shapolsky v. Brewton*, 56 S.W.3d 120, 133 (Tex.App.-Houston [14th Dist.] 2001, no pet.) (noting also that officer of corporation is always primarily liable for own torts, even though principal is also liable for those actions).

and gives rise to duty to disclose information).

Second, the evidence supports the jury's findings that Mission Control and Haynes both knew of the falsity of these representations, or made them recklessly without knowledge of the truth, and intended GGP to rely on them. Haynes's ultimate admission that Mission Control failed to pay numerous media outlets as promised at least creates the inference that Haynes acted recklessly when he told GGP in early 2001 that he had sent payment to the media outlets and that they were mistaken in reporting the accounts as delinquent. Indeed, Sevedge testified that records revealed Mission Control had incurred unpaid debt for GGP since 2000 and, in some cases, as long as a year before Haynes disclosed the problem in June 2001. Moreover, the record reveals that after Haynes initially reassured GGP, Mission Control continued to withhold GGP's payments until June 2001. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434–35 (Tex.1986) (noting that fraudulent intent may be proven by circumstantial evidence and by the party's acts subsequent to the representation). Further, Haynes admitted he used the funds intended for the media outlets to pay other creditors of Mission Control. This evidence demonstrates both Haynes's and Mission Control's knowledge of falsity or reckless disregard for the truth and their intent for GGP to rely on fraudulent conduct.

Finally, the evidence supports the jury's findings as to GGP's reliance on Mission Control and Haynes's misrepresentations and omissions and as to the resulting injury. After it contacted Mission Control in early 2001 about the media outlets' complaints, GGP relied on assurances from Mission Control and Haynes that nothing was wrong in continuing to conduct business with Mission Control. As a result of its reliance, the evidence reveals that GGP sustained out-of-pocket damages from "double" paying the media outlets $56,000 without repayment from Mission Control. *See Baylor Univ. v. Sonnichsen,* 221 S.W.3d 632, 636 (Tex.2007) (noting that Texas recognizes out-of-pocket damages for common-law fraud and that such damages "measure the difference between the value of that which was parted with and the value of that which was received"). Although Haynes denied Mission Control was obligated to repay GGP's double payment, Sevedge testified to the contrary, and the jury was free to believe his testimony over Haynes's. *See Wilson,* 168 S.W.3d at 819. Moreover, Haynes's emphasis on GGP's admission that it received all the advertising spots represented by the $56,000 is misplaced, given that GGP had to expend twice the value of these spots to receive them. Finally, Haynes's contention that GGP paid the $56,000 with "eyes wide open" fails because, but for Mission Control and Haynes's misrepresentations and omissions on which GGP relied, GGP would not have had to pay this amount out of pocket. *See Tilton v. Marshall,* 925 S.W.2d 672, 680 (Tex.1996) (holding that ordinary measure of damages in fraud case is actual amount of plaintiff's loss that directly and proximately results from defendant's fraudulent conduct); *see, e.g., Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.,* 202 S.W.3d 250, 269–70 (Tex.App.-Corpus Christi 2006, pet. filed) (finding legally sufficient evidence of out-of-pocket damages where appellee, in reliance on appellant's fraud, expended funds for business activities); *1001 McKinney Ltd. v. Credit Suisse First Boston Mortgage Capital,* 192 S.W.3d 20, 29–30 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (holding appellant created fact issue as to recovery for out-of-pocket·fraud damages where, in reliance on appellee's promises to lend additional funds for build-

ing renovation, appellant alleged it continued to renovate building and enter into lease agreements).

As such, we conclude the evidence would enable reasonable and fair-minded people to reach the findings of fraud and that such findings are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

We overrule issues one and two.

### B. Alter Ego: Solutioneers

■ In issue three, Haynes contends the evidence is legally and factually insufficient to support the jury's finding that Solutioneers constituted his alter ego and, thus, insufficient to hold him personally liable for Solutioneers's breach of contract.[6] Haynes argues that, even if Solutioneers constituted the alter ego of Haynes, there is no evidence he used Solutioneers to perpetrate an actual fraud or that he perpetrated any such fraud primarily for his own direct personal benefit, as required under article 2.21(A) of the Texas Business Corporation Act.

■ The Texas Business Corporation Act provides that an owner of a corporation is not liable for contractual obligations of the corporation under an alter ego theory unless the plaintiff demonstrates the

owner "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the ... owner." *See* TEX. BUS. CORP. ACT ANN. art. 2.21(A)(2) (Vernon 2003). The alter ego doctrine applies "when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *Castleberry v. Branscum,* 721 S.W.2d 270, 272 (Tex.1986); *see Cappuccitti v. Gulf Indus. Prods., Inc.,* 222 S.W.3d 468, 481 (Tex.App.-Houston [1st Dist.] 2007, no pet.); *Puri v. Mansukhani,* 973 S.W.2d 701, 713 (Tex.App.-Houston [14th Dist.] 1998, no pet.). Actual fraud involves dishonesty of purpose or intent to deceive. *See Castleberry,* 721 S.W.2d at 273.

■ GGP cites the following evidence in support of the jury's findings of alter ego, actual fraud, and direct personal benefit:

- Sevedge testified that Haynes said he wanted to conduct sponsorship business using Solutioneers, instead of Mission Control, because Haynes "was the sole person that was going to be selling the sponsorships," such "was primarily [Haynes's] work," and thus Haynes did not want "to share [income] with [Mis-

---

**6.** Within his legal sufficiency argument, Haynes contends the instruction to the alter ego question was legally erroneous and should not have been submitted. He appears to complain the instruction did not encompass the "actual fraud" requirement in article 2.21(A)(2) of the Texas Business Corporation Act. *See* TEX. BUS. CORP. ACT. ANN. art 2.21(A)(2) ("[T]he ... owner ... caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the ... owner...."). At the charge conference, Haynes objected to this instruction only on legal and factual insufficiency grounds, not that it failed to include a required element. Thus, we conclude Haynes has waived this

complaint. *See* TEX.R.APP. P. 33.1(a); TEX.R. CIV. P. 274 ("A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections."); *Knox v. Taylor,* 992 S.W.2d 40, 65 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (holding complaint on appeal must comport with objection in trial court). In any event, we note that the instruction's language in fact tracks the "actual fraud" language from article 2.21(A)(2) and that GGP does not dispute that article 2.21(A)(2) governs.

sion Control employees] who would not be contributing much to . . . selling sponsorship[s]."

• Sevedge further testified that, after revelation of the Mission Control situation, Haynes admitted he formed Solutioneers so that he could shelter the sponsorship commission income from Mission Control's creditors. Haynes denied making this comment.

• Haynes met with his lawyers early in 2002 about moving contractual obligations from Mission Control to Solutioneers.

• The $10,000 advance commission payment intended for Solutioneers was made out to Mission Control and indorsed by Mission Control/Haynes Media & Marketing.

• The draft contract between Solutioneers and GGP called for payment to Haynes individually.

• Haynes lied to GGP about whether he deposited the first Miller sponsorship payment.

• In obtaining GGP's underwriting of a program called The Boxing Show, for which GGP agreed to pay Solutioneers $3,600 per week, Haynes failed to disclose that he received $1,900 of this amount back, and Sevedge testified he would not have agreed to this deal if he knew about Haynes's $1,900 payment.

• GGP's payments to Haynes "kept the businesses that Haynes owned afloat, [and, therefore,] Haynes continued to receive a salary," and Haynes's "ownership interest benefited [sic] from the assets Mission Control and Solutioneers were able to retain."

We disagree with Haynes that GGP, by withdrawing its fraud claim against Solutioneers, in essence admitted he and Solutioneers failed to commit actual fraud. The jury was instructed it could not find Haynes was responsible for Solutioneers's conduct without a finding of actual fraud, and, thus, in making this finding, it impliedly found actual fraud. *See Cass v. Stephens,* 156 S.W.3d 38, 58–59 (Tex.App.-El Paso 2004, pet. denied) (holding that jury impliedly found actual fraud in making alter ego finding because it was instructed it could not find alter ego without finding of actual fraud).

However, we nonetheless conclude that the record does not reveal more than a scintilla of evidence supporting the jury's finding that any fraud Haynes perpetrated by using Solutioneers to retain or misappropriate Miller sponsorship payments was primarily for his direct personal benefit. The record does not show what Haynes did with these funds, including, for example, whether he deposited them into his own personal account or used them to purchase personal items or to pay personal debts. *Compare Farr v. Sun World Sav. Ass'n,* 810 S.W.2d 294, 298 (Tex.App.-El Paso 1991, no writ) (upholding finding of direct personal benefit under article 2.21(A)(2) because shareholder deposited proceeds from sale of note in mortgage company's account, rather than tendering them to lender as agreed, and then used proceeds to pay personal stock purchase loans), *with Bates v. de Tournillon,* No. 07–03–0257–CV, 2006 WL 265474, at *3 (Tex.App.-Amarillo Feb.3, 2006, no pet.) (mem.op.) (holding evidence legally insufficient to support finding that corporation was alter ego of sole shareholder under article 2.21(A)(2) because, though shareholder moved equipment and inventory used by corporation into storage after default on lease, to which lessor and third parties had interest, there was no evidence he personally made use of such items or that his actions were otherwise primarily for his direct personal benefit), *and Scott v. McKay,* No. 12–02–00195–CV, 2003 WL 21998629, at *2 (Tex.App.-Tyler Aug.20,

2003, no pet.) (mem.op.) (finding no evidence of alter ego under article 2.21(A)(2) because there was no evidence that shareholder used loan to corporation for personal benefit and evidence showed only that loan was deposited into corporation's bank account and used to pay corporate debt and salaries). Indeed, though the draft contract called for payment to Haynes individually, the final contract calls for payment to Solutioneers. Moreover, even if we assume maintaining a personal salary from or ownership interest in Solutioneers—by misappropriating the Miller sponsorship payment in order to keep Solutioneers afloat-constitutes a direct personal benefit under article 2.21(A), we find no evidence in the record regarding any salary Haynes received from Solutioneers or any evidence illustrating how Haynes's conduct surrounding the Miller transaction affected this salary.[7] *Compare In re Morrison,* 361 B.R. 107, 120 (Bankr.W.D.Tex. 2007) (applying article 2.21(A)(2) and concluding that majority stockholder received direct personal benefit from misrepresenting financial health of corporation to obtain lucrative contract for corporation, as stockholder knew he needed contract to keep corporation afloat and thus draw his salary, which records indicated was "substantial").

Accordingly, because we conclude that the record reveals a complete absence of evidence of direct personal benefit to Haynes resulting from fraud in relation to Solutioneers and the Miller sponsorship, we sustain issue three.[8]

## C. Excuse for Breach of Contract: GGP

 In issue four, Mission Control claims the evidence is legally[9] insufficient to support the jury's finding that GGP was excused for breaching its contract with Mission Control and maintains the jury thus should have awarded Mission Control unpaid commissions under the agency contract pursuant to its counterclaim for breach. Mission Control asserts that GGP's only alleged excuse for failing to pay the commissions was Mission Control's error in calculating the amount due and that GGP refused to pay even after Mis-

---

7. The only reference to a salary of any kind appears in Sevedge's testimony concerning his negotiations with Haynes about a repayment schedule for GGP's double payment of the $56,000 for the debt Mission Control incurred and appears to relate only to Haynes's salary from Mission Control.

8. In a footnote in his brief, Haynes notes that the judgment does not explicitly refer to the jury's finding of alter ego as to Mission Control and concludes that GGP has waived any issue in this regard. Haynes then contends that, "to the extent [this] jury finding . . . remains at issue," the evidence was legally and factually insufficient to support the jury's finding of alter ego as to Mission Control, citing its arguments regarding Solutioneers in support. GGP counters that it has not waived the argument and that the evidence is legally and factually sufficient. However, neither party requests relief specific to this finding or otherwise explains how our disposition of this issue would affect this appeal. As such, we conclude that both parties have failed to present error regarding this issue to this court, and, accordingly, we need not address it. *See* Tex.R.App. P. 33.1(a).

9. In its brief, Mission Control argues that the jury's finding of excuse is based on "no evidence," and it does not distinguish its analysis, as in its other issues, between legal and factual sufficiency. To the extent Mission Control attempts to bring a factual sufficiency challenge as to this finding, we hold it has waived such issue. Tex.R.App. P. 33.1(a). *See generally Tacon Mech. Contractors, Inc. v. Grant Sheet Metal, Inc.,* 889 S.W.2d 666, 669–70 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (holding appellant bringing legal and factual sufficiency challenges waived factual sufficiency point because appellant failed to present any argument, or citations to authority or record for such alternative claim).

sion Control corrected the error. GGP counters that the jury was instructed that its breach of the agency contract would be excused if it found Mission Control breached the contract first, and, in a separate question, the jury found Mission Control breached the contract. To this end, Mission Control claims the "contract" the jury found it breached—a term the charge did not expressly define—was a separate agreement with GGP to fund the buy down of the $56,000 debt, not the agency contract. Thus, Mission Control concludes, the jury's finding that it breached the buy down agreement could not have served as a basis for excusing GGP's breach of the agency contract.

We initially address whether Mission Control preserved its legal sufficiency complaint regarding the jury's finding of GGP's excuse for breach of contract. "A 'no evidence' issue is preserved for appeal in one of five ways: (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or (5) a motion for new trial." *Halim v. Ramchandani*, 203 S.W.3d 482, 487 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (citing *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991)). We have reviewed Mission Control's motion for directed verdict, its objections at the charge conference, its motion for judgment notwithstanding the verdict, and its motion for new trial and find no arguments that could be construed as challenging the sufficiency of the evidence relating to GGP's excuse for breaching the contract with Mission Control. Indeed, Mission Control failed to lodge an objection to the jury question on GGP's excuse at the charge conference. Moreover, in its motion for judgment notwithstanding the verdict and motion for new trial, Mission Con-

trol challenged only the sufficiency of the evidence to support the jury's finding that Mission Control itself breached the contract; specifically, Mission Control asserted that GGP suffered no injury and that the jury disregarded its affirmative defense of unclean hands. As such, we hold that Mission Control failed to preserve its legal sufficiency challenge to the jury's finding regarding GGP's excuse for breach of contract for our review.

We overrule issue four.

### III. CONCLUSION

We conclude the evidence is legally and factually sufficient to support the jury's findings of breach of contract and fraud as to Mission Control and Haynes. We further conclude the evidence is legally and factually insufficient to support the jury's finding that Solutioneers constitutes an alter ego of Haynes. We finally conclude the evidence is legally sufficient to support the jury's finding that GGP was excused for its breach of contract with Mission Control. Accordingly, we affirm the trial court's judgment with respect to issues one, two, and four, and reverse and render judgment with respect to issue three.