**Reversed and Rendered and Memorandum Opinion filed August 5, 2021.**



In The

# Fourteenth Court of Appeals

## NO. 14-19-00378-CV

**GREG MUNGAS, Appellant**

**V.**

**ODYSSEY SPACE RESEARCH, LLC, Appellee**

**On Appeal from the 269th District Court
Harris County, Texas
Trial Court Cause No. 2014-74090**

## MEMORANDUM OPINION

In this appeal, appellant Greg Mungas challenges the jury's finding that he was responsible for the debts of Firestar Engineering, LLC, a company he founded and solely owned, based on a theory of alter-ego liability. Concluding that the jury's alter-ego finding was not supported by legally-sufficient evidence, we reverse the trial court's judgment and render a take-nothing judgment in favor of Mungas on appellee Odyssey Space Research, LLC's claims against him.

# I.  BACKGROUND

Greg Mungas is the president and the sole owner of Firestar Engineering, LLC. Between 2011 and 2014, Firestar was developing technologies related to non-toxic rocket fuel. Firestar and appellee Odyssey Space Research, LLC[1], became entwined in a variety of business dealings, including jointly forming and investing in business entities for the purpose of developing fuel-system technology and securing National Aeronautics and Space Administration (NASA) and Department of Defense contracts.[2] Firestar and Odyssey created an entity called Typhon Labs, LLC, in which both companies possessed an ownership interest, to set up test facilities for the non-toxic rocket-fuel technology. To get Typhon's test labs operational, Firestar borrowed funds from Odyssey, which was memorialized in three promissory notes from December 2010, April 2011, and June 2011. It is undisputed that the notes were never repaid.

In early 2012, Firestar was awarded a Small Business Innovative Research ("SBIR") Phase I contract by NASA, in which Odyssey performed certain work as a "key subcontractor." Though Odyssey performed all the work required by September 2012, Firestar did not pay Odyssey until January 2014. NASA awarded Firestar a SBIR Phase II contract in late 2012, in which Firestar again contracted with Odyssey to perform some work. The original contract between Firestar and Odyssey for this SBIR work was signed in January 2013. By March 2014, Odyssey had completed all the Phase II work and invoiced Firestar for the work, though

---

[1] Dave Strack and Brian Rishikof are the two owners of Odyssey Space Research, LLC.

[2] Strack, Rishikof, and Mungas (as well as several other unrelated individuals) formed a separate business entity, Innovative Space Propulsion Holdings (ISPH), for the purpose of developing new fuel-system technology. Typhon Labs, LLC was set up to provide testing facilities for the ISPH contracts and research. Strack and Rishikof created a separate corporate entity, O-Star Propulsion, LLC, to invest in ISPH. However, for purposes of this opinion, we do not fully delve into the complex relationship between the ownership of Odyssey and Firestar and all the various entities that were created to structure investments and research.

Firestar had not made any payment on those invoices. Mungas contacted Strack and Rishikof and requested "novation" of the contract between Odyssey and Firestar. He advised Strack and Rishikof that Firestar was struggling financially and not able to pay its creditors.

After negotiations, Firestar and Odyssey entered into an agreement on May 9th to address the obligations of Firestar to Odyssey under the SBIR contract for the Phase II work completed. In addition to an expanded Phase II scope of work, the agreement called for a joint-checking account to be set up under the control of Strack and Rishikof. Firestar agreed to direct the entirety of the remaining Phase II SBIR payments due from NASA to the joint account to ensure that Odyssey would receive payment for its SBIR work. Following the May 9th agreement, Odyssey was paid for three of the four invoices submitted to Firestar for Phase II SBIR work. It is undisputed that Odyssey satisfactorily completed all the Phase II SBIR work in February 2015. Mungas redirected the final payment from NASA in February 2015 away from the joint account once work was complete. Odyssey was never paid on its final invoice for the Phase II SBIR work.

In December 2014, Odyssey filed suit against Firestar for recovery of the monies owed to it under the three promissory notes. After Firestar redirected the final payment for the SBIR work, Odyssey amended its petition to add its claims for breach of contract, added Mungas as a defendant, and asserted alter-ego liability against Mungas. The case was tried to a jury in March 2017, resulting in a verdict in favor of Odyssey and against Firestar. The jury also found that Mungas was liable for Firestar's obligations based on a theory of alter-ego liability. The trial court signed the final judgment on July 7, 2017.[3]

------

[3] Mungas and Firestar filed a motion for new trial in August 2017, which was overruled by operation of law. *See* Tex. R. Civ. P. 329b(c). Mungas then filed a Chapter 7 bankruptcy

## II.   ANALYSIS

Mungas presents three issues to this court. In issue 1, Mungas argues that he is not personally liable for the promissory notes executed by Firestar and the unpaid invoice owed by Firestar. In issue 2, he argues that the jury's finding that Mungas was responsible for Firestar's debts was not supported by legally- or factually-sufficient evidence. In issue 3, Mungas asserts the trial court erred by denying Mungas's motion for judgment notwithstanding the verdict and motion for new trial. Because issue 1 does not identify any error in the trial court, it presents nothing for us to review. *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (issues on appeal do not meet requirements of Texas Rules of Appellate Procedure if they do not point out any error allegedly committed by trial court). We turn to whether the jury's finding that Mungas was responsible for Firestar's debts was supported by legally- and factually-sufficient evidence.

## A.   Standard of review

When considering a legal-sufficiency challenge, we review the evidence in the light most favorable to the jury's finding, crediting favorable evidence if a reasonable fact finder could do so and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 822, 827 (Tex. 2005). When an appellant challenges the legal sufficiency of a finding on which it did not have the burden of proof, it must show that there is no evidence to support the finding. We will sustain a legal-sufficiency point if the record shows that: (1) there is a complete absence of a vital fact; (2) the court is barred by the rules of law or evidence from giving weight to the only evidence

---

proceeding in September 2017, which stayed the proceedings until April 2019. Mungas filed his notice of appeal in this proceeding less than 30 days after the stay was lifted. *See* 11 U.S.C. § 108(c).

offered to prove a vital fact; (3) the evidence offered to prove the vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. The jury is the sole judge of witness credibility and the weight to be assigned to a witness's testimony. *Id.* at 819.

## B.       Statutory standards for individual liability

Firestar is a limited-liability company. A member or manager of a limited-liability company is not liable for the company's debts, obligations, or liabilities under a judgment, decree, or order of a court except to the extent the company agreement specifically provides otherwise. *See* Tex. Bus. Orgs. Code Ann. § 101.114. However, the principles and law applicable to disregarding the corporate fiction apply to limited-liability companies. Tex. Bus. Orgs. Code Ann. § 101.002(a) (providing that section 21.223 applies to limited-liability companies and their members).

A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally be shielded from personal liability for the corporation's contractual obligations as a separate legal entity. *See Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006). Under the common law, when the corporation's affiliate—such as an owner, shareholder, officer, or director—has used the corporate form "as part of a basically unfair device to achieve an inequitable result," courts have been willing to disregard the corporate structure and have allowed a corporate obligee to hold a corporate affiliate personally liable for the corporation's obligations. *See, e.g.*, *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986). However, the legislature has taken a "stricter approach to disregarding the corporate structure." *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008).

The Business Organizations Code reflects the legislative limits on recovery

from an individual based on a corporation's obligations. *See* Tex. Bus. Orgs. Code Ann. §§ 21.223, .224. The Business Organizations Code provides, in relevant part, that:

> (a) A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to:
>
> . . . .
>
> (2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory; or
>
> (3) any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality, including the failure to:
>
>> (A) comply with this code or the certificate of formation or bylaws of the corporation; or
>>
>> (B) observe any requirement prescribed by this code or the certificate of formation or bylaws of the corporation for acts to be taken by the corporation or its directors or shareholders.

*Id*. § 21.223(a)(2), (a)(3). Section 21.223(b) provides the following exception to the statutory protection.

> Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

*Id*. § 21.223(b).[4] This statute is "exclusive and preempts any other liability imposed for that obligation under common law or otherwise." Tex. Bus. Orgs. Code Ann. § 21.224. "Generally, alter ego will not apply to disregard the corporate form absent exceptional circumstances." *Nugent v. Estate of Ellickson*, 543 S.W.3d 243, 266 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

**C.     The jury question is the measure for the sufficiency of the evidence**

Question No. 6—the question on alter-ego liability—submits the standards set forth in Texas Pattern Jury Charges 108.1 and 108.2, as well as Business Organizations Code section 21.223. *See* Tex. Bus. Orgs. Code Ann. § 21.223; Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business* PJC 108.1, 108.2 (2018). The jury was presented with following question on alter-ego liability:

Question No. 6

Is Greg Mungas responsible for the conduct of Firestar?

Greg Mungas is "responsible" for the conduct of Firestar if:

a) Firestar was organized and operated as a mere tool or business conduit of Greg Mungas;

b) there was such unity between Firestar and Greg Mungas that the separateness of Firestar had ceased and holding only Firestar responsible would result in injustice; and

c) Greg Mungas caused Firestar to be used for the purpose of perpetrating and did perpetrate an actual fraud on Odyssey

---

[4] Section 21.225 provides two additional exceptions to section 21.223's liability limitation. *See* Tex. Bus. Orgs. Code Ann. § 21.225. Section 21.223 "does not limit the obligation of a holder, beneficial owner, subscriber, or affiliate to the obligee of the corporation if that person: (1) expressly assumes, guarantees, or agrees to be personally liable to the obligee for the obligation; or (2) is otherwise liable to the obligee for the obligation under this code or other applicable statute." *Id*. The parties do not assert these exceptions apply in this case, and we do not address them in our analysis.

primarily for the direct personal benefit of Greg Mungas.

In deciding whether there was such unity between Firestar and Greg Mungas that the separateness of Firestar had ceased, you are to consider the total dealings of Firestar and Greg Mungas, including:

a) the degree to which Firestar's property had been kept separate from that of Greg Mungas;

b) the amount of financial interest, ownership, and control Greg Mungas maintained over Firestar; and

c) whether Firestar had been used for personal purposes of Greg Mungas.

Answer "Yes" or "No."

The jury answered "Yes" in response to Question 6. Because Mungas did not object to Question 6, the charge as submitted is the proper measure of the sufficiency of the evidence.[5] *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

The jury charge provided three elements that were required in order to support the imposition of individual liability on the part of Mungas: (1) Firestar was organized and operated as mere tool or business conduit of Greg Mungas; (2) there was such unity between Firestar and Greg Mungas that the separateness of Firestar has ceased and holding only Firestar responsible would result in injustice; and (3) Greg Mungas caused Firestar to be used for the purpose of perpetrating and did perpetrate an actual fraud on Odyssey primarily for the direct personal benefit of Greg Mungas.[6] In this appeal, Mungas challenges the

---

[5] Mungas did challenge the sufficiency of the evidence to support this question but there was no objection by any party to the form of the question.

[6] Mungas complains that Odyssey relies on old case law that has been superseded by statute. While some precedent including *Castleberry v. Branscum* has been overruled in part by the legislature, *Castleberry* remains precedential in some respects as discussed further herein. 721 S.W.2d 270 (Tex. 1986). Mungas's cursory dismissal of any case law predating the legislature's 1989 amendment to the Business Corporation Act (predecessor statute to Business Organizations Code) is misplaced. *See* Act of May 26, 1989, 71st Leg., R.S., ch. 217, § 1, 1989 Tex. Gen. Laws 974, 974–75 (expired January 1, 2010).

sufficiency of the evidence supporting the first and third elements. We begin with the third element.

## D. Evidence of direct personal benefit resulting from fraud

The jury charge, consistent with statute, required supporting evidence that Mungas perpetrated an actual fraud on Odyssey primarily for his direct personal benefit. *See* Tex. Bus. Orgs. Code Ann. § 21.223; *see also Viajes Gerpa, S.A. v. Fazeli*, 522 S.W.3d 524, 532 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). The term "actual fraud" appearing in the jury charge is not defined. The term as used in section 21.223(b) is also not defined. In *Castleberry v. Branscum*, the supreme court defined actual fraud in the context of piercing the corporate veil as "involving dishonesty of purpose or intent to deceive." 721 S.W.2d at 273. This court and several others have endorsed the *Castleberry* definition of "dishonesty of purpose or intent to deceive" for addressing claims of alter-ego liability. *See TecLogistics, Inc. v. Dresser-Rand Group, Inc.*, 527 S.W.3d 589, 598 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("Actual fraud usually involves dishonesty of purpose or intent to deceive"); *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 387 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *TransPecos Banks v. Strobach*, 487 S.W.3d 722, 731 (Tex. App.—El Paso 2016, no pet.) ("[R]elying on the language in *Castleberry*, this Court has, along with several of our sister courts, recognized that the actual fraud requirement in the Code involves "dishonesty of purpose or intent to deceive[.]").

### 1. Promissory notes

We first consider whether Mungas used Firestar to perpetrate an actual fraud on Odyssey for his direct personal benefit. Odyssey argues that Mungas acted with "dishonesty of purpose or intent to deceive" because "he was having Firestar borrow money while he had Firestar paying himself for purported loans." Odyssey

further argues that a reasonable jury could believe that Mungas engaged in those actions for his own benefit. In response, Mungas argues he did not utilize Firestar to engage in any fraudulent conduct, nor did he receive any personal benefit with respect to the promissory notes. In addition, he argues that Odyssey knew it was dealing with a limited-liability company and did not request a guarantee or security.

This court's precedent is instructive. In *Viajes Gerpa*, we considered the legal sufficiency of the evidence supporting an alter-ego theory to pierce the corporate veil and impose personal liability on an individual. 522 S.W.3d at 533–35. Underlying the dispute in *Viajes Gerpa* was a 2007 settlement agreement that required The Ticket Company and its president, Seyed Fazeli, to remit payments to the plaintiff and other travel agencies to compensate for a failure to procure tickets to the World Cup tournament. *Id*. at 527–28. After The Ticket Company failed to make its required payments, the plaintiff sued Fazeli and others alleging that Fazeli was individually liable under section 21.223 for The Ticket Company's debts created pursuant to the 2007 settlement agreement. *Id*. at 529 (citing Tex. Bus. Orgs. Code Ann. § 21.223). The jury returned a verdict for the plaintiff on its alter-ego claim, on which the court rendered judgment. *Id*. at 529–530. On the defendants' subsequent motion for new trial, the trial court vacated the judgment and rendered a take-nothing judgment in favor of Fazeli and The Ticket Company. *Id*. at 530.

In affirming the trial court, we explained: "[T]o support individual liability under section 21.223, there must be evidence of direct personal benefit to [Fazeli] resulting from fraud *in connection* to The Ticket Company and the [settlement agreement] with [the plaintiff.]" *Id*. at 534. The evidence showed that Fazeli used The Ticket Company's funds to pay his mortgage, and the Company's banking

records reflected regular large cash withdrawals. *Id.* at 533. Concluding that the evidence was legally insufficient to support individual liability under section 21.223, we stated that the evidence "reflect[ed] general (mis)handling of corporate accounts, record keeping, and operations," but failed to demonstrate that any fraudulent conduct was related to the 2007 settlement agreement. *Id.* at 535.

Similarly, the jury charge—tracking the language of section 21.223—required supporting evidence in the record of a direct personal benefit to Mungas resulting from fraud in connection to Odyssey and the promissory notes. *Viajes Gerpa*, 522 S.W.3d at 534. Odyssey cites the fact that Mungas made "transfers" to and from himself in the same year that he borrowed funds from Odyssey. Odyssey claims this pattern of loans and repayments to avoid tax liability, as well Mungas's testimony that he renewed his loans to extend the statute of limitations, reflects a direct personal benefit to Mungas. However, even if Mungas's actions in extending statutes of limitation on his loans to the company conferred a direct personal benefit to Mungas, Odyssey did not produce any evidence that this benefit was had in connection with fraud perpetrated on Odyssey. The promissory notes were executed in favor of Odyssey for the purpose of securing and preparing testing facilities for Typhon. Mungas testified that all three promissory notes were used for securing the facilities and equipment. Though Dave Strack of Odyssey testified that Mungas originally represented that the third promissory note was to be used for an intellectual-property payment, rather than equipment, Odyssey does not contend that Firestar or Mungas failed to set up those facilities or secure the equipment or intellectual property required for Typhon. Though Strack did testify there were differences of opinion as to the cost of equipment purchased for Typhon, this testimony does not provide evidence of dishonesty of purpose or

11

intent to deceive.[7]

That Mungas renewed loans he made to Firestar during the same year that Firestar executed the promissory notes to Odyssey is not enough to establish actual fraud on the part of Mungas in connection with the promissory notes. The evidence may reflect financial mismanagement of funds, as in *Viajes Gerpa*, or it may reflect that Firestar anticipated raising more funds or securing revenue streams that never came to fruition.[8] Regardless, the evidence is not legally sufficient to support the conclusion that Mungas used Firestar to perpetrate a fraud on Odyssey in connection with the promissory notes. *See Viajes Gerpa*, 522 S.W.3d at 535; *Solutioneers Consulting*, 237 S.W.3d at 389 ("Moreover, even if we assume maintaining a personal salary from or ownership interest in Solutioneers—by misappropriating the Miller sponsorship payment in order to keep Solutioneers afloat—constitutes a direct personal benefit . . . , we find no evidence in the record regarding any salary Haynes received from Solutioneers or any evidence illustrating how Haynes's conduct surrounding the Miller transaction affected this salary."); *Menetti v. Chavers*, 974 S.W.2d 168, 175 (Tex. App.—San Antonio 1998, no pet.) ("What the evidence abundantly shows is that the Menettis were careless bookkeepers and perhaps enjoyed the tax advantages of living off their corporate funds with little effort to preserve the corporate fiction. . . [w]hat the

---

[7] Odyssey also argues that Mungas made misrepresentations to Odyssey regarding Tyhpon's rent, the cost of a consultant completing work for Typhon, misrepresenting accounts payable for "various of the entities," failing to disclose alleged loans from Firestar to Typhon and presenting invoices to be paid. However, Odyssey generally cites to these misrepresentations to demonstrate that Mungas was not credible. Odyssey does not contend these misrepresentations were made in connection to either the promissory notes or the May 9th agreement. Because these misrepresentations do not relate to the transactions at issue, they are not evidence supporting the jury's finding of alter-ego liability in this case.

[8] Mungas and Strack both testified that one of the main goals in setting up ISPH and Typhon was to secure a major long-term Defense Advanced Research Projects Agency (DARPA) subcontract. However, ISPH was ultimately not included in the DARPA contract.

record does not show is that the Menettis committed actual fraud against the Chaverses that would justify piercing the corporate veil.").

### 2. Odyssey's unpaid SBIR work pursuant to the May 9th agreement

Turning to Firestar's breach of the May 9th agreement, there is no dispute that Firestar did not make the final payment as required by the agreement. Mungas admitted that he redirected the payment from NASA but asserts there is no evidence of fraudulent conduct on his part. Firestar paid three of the four invoices for the Phase II SBIR covered by the May 9th agreement, which Mungas relies on as evidence that he did not perpetrate an actual fraud on Odyssey by entering into the May 9th agreement. Because Odyssey had already filed suit on the promissory notes when the final invoice was due, Mungas argues his withholding of the final payment was tied to the dispute between the parties.

Emphasizing that Mungas waited until the Phase II SBIR work was complete before redirecting the final payment, Odyssey maintains that Mungas satisfied the fraud requirement by acting "with dishonesty of purpose" by failing to advise Odyssey that he was going to redirect the final payment. Odyssey further argues the evidence at trial established that Mungas misdirected the final payment to Odyssey for his own benefit, to pay himself on loans. However, as discussed with regard to the promissory notes, Odyssey had the burden to support its alter-ego claim with evidence of a direct personal benefit to Mungas resulting from actual fraud in connection to Odyssey and the May 9th agreement. *See Viajes Gerpa*, 522 S.W.3d at 534; *see also Menetti*, 974 S.W.2d at 175; *Ocram, Inc. v. Bartosh*, No. 01-11-00793-CV, 2012 WL 4740859, at *3 (Tex. App.—Houston [1st Dist.] Oct. 4, 2012, no pet.). The transaction at issue is the May 9th agreement,

13

not Mungas's later actions resulting in Firestar's breach of contract.[9] The only conduct identified by Odyssey as evidence of actual fraud in connection with the May 9th agreement was Mungas's failure to advise Odyssey that he intended to redirect the payment, which occurred well after the parties entered the agreement.

The testimony at trial does not reflect that Mungas engaged in any dishonesty of purpose or intent to deceive in connection with the May 9th agreement. Mungas approached Strack and Rishikof requesting "novation" of the contract for SBIR work in March 2014. At the time, Mungas testified that Firestar had approximately $500,000 to $700,000 in debt. Leading up to the May 9th agreement, Mungas communicated to Strack and Rishikof that Firestar was not able to pay existing debt. Mungas described a situation in which Firestar did not have adequate income streams to pay its expenses. He further described that the related entities in which Odyssey was involved, Typhon and ISPH, were also unable to cover their costs and owed significant debt to Firestar. Mungas explained

---

[9] There are two transactions involved in this lawsuit: the promissory notes and the May 9th agreement. With respect to the SBIR work, the jury charge included the following question:

**Question No. 2**
Did Firestar fail to comply with the May 9 Agreement?

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:
    a) the extent to which the injured party will be deprived of the benefit which it reasonably expected;
    b) the extent to which the injured party can be adequately compensated for the part of that benefit of which it will be deprived;
    c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
    d) the likelihood that the party failing to perform or to offer to perform will cure its failure, taking into account the circumstances including any reasonable assurances; and
    e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Answer "Yes" or "No."

14

Firestar's financial condition in part as attributable to working on "projects that don't pay (and have a long history on the books of doing so)." Rishikof also testified that during the negotiations of the May 9th agreement he was concerned there was significant likelihood that Odyssey might be unpaid on the expanded scope of work agreed to in the May 9th agreement. Assuming Firestar breached the May 9th agreement, any such breach by Firestar standing alone is not enough to disregard the corporate fiction.

The record does not reflect that Mungas induced Odyssey into entering an agreement that Firestar had no intention of honoring. It is undisputed that Firestar paid Odyssey for all the work it performed under the Phase I SBIR and three of the four invoices submitted by Odyssey for the Phase II SBIR work. Though many of the payments due to Odyssey were paid late; this course of dealing does not support a finding that Mungas used Firestar to perpetrate a fraud on Odyssey. It is also noteworthy that Odyssey was aware that Firestar was struggling financially and unable to service its existing debt. Despite this knowledge, Odyssey entered the May 9th agreement and expanded its scope of work without seeking a personal guaranty. *Cf. TransPecos Banks*, 487 S.W.3d at 733 ("The Bank was therefore aware of the possibility that if Jones defaulted on virtually any of his loans, these senior deeds would be foreclosed on, which would in turn cause the domino effect of extinguishing the 2003 junior deed as well, thereby taking away the Corporation's only asset."). Therefore, we conclude the evidence is not legally sufficient to support the jury's finding that Mungas used Firestar to perpetrate an actual fraud on Odyssey in connection with the May 9th agreement. Because we conclude there is no evidence supporting the third element, we do not address the parties' arguments as to the first element—whether Firestar was organized and operated as mere tool or business conduit of Mungas. Tex. R. App. P. 47.1.

15

We sustain Mungas's issue 2. Because we have determined that the evidence is legally insufficient to support the jury's "yes" answer in response to Question No. 6, we do not address Mungas's factual-sufficiency challenge or issue 3. *See* Tex. R. App. P. 47.1.

### III. CONCLUSION

We reverse the trial court's judgment and render a take-nothing judgment on Odyssey's claims against Mungas.

/s/ Charles A. Spain
   Justice

Panel consists of Justices Hassan, Spain, and Poissant.