**Affirmed and Opinion Filed December 8, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00999-CV

**LOUIS MARTIN, JR., Appellant**

**V.**

**U.S. MERCHANTS FINANCIAL GROUP, INC., Appellee**

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 10-15757**

## MEMORANDUM OPINION

Before Justices Francis and Myers[1]

Opinion by Justice Myers

U.S. Merchants Financial Group, Inc. (Merchants) obtained a California default judgment against Synergy Design Group, Inc. (Synergy) based on a breach of contract complaint. In an effort to collect the California judgment, Merchants next brought suit in California against Synergy's vice president, Louis Martin, Jr.; that suit was dismissed for lack of personal jurisdiction over Martin. Using an alter ego theory, Merchants then brought suit against Martin in Texas to collect the California judgment. Following a bench trial, the trial court rendered judgment against Martin for the amount of the California judgment plus interest and court costs.

In his issues on appeal, Martin contends the trial court erred by (1) failing to find this action is barred by statute; (2) failing to find this action is barred by collateral estoppel; (3)

---

[1] Justice David Lewis was a member of the panel and participated at the submission of this case, but he did not participate in the issuance of this opinion. *See* TEX. R. APP. P. 41(b).

finding the evidence sufficient to support the finding that Martin caused the corporation to perpetrate a fraud; and (4) finding the evidence sufficient to support the necessary actual fraud required to pierce the corporate veil. We affirm the trial court's judgment.

## I. Factual and Procedural Background

Martin and his business partner, Chuck Clark, sold a road flare called the "TurboFlare 360" under the corporate structure of Synergy. To secure a $2.75 million dollar order with Sam's Club, Martin was directed to contact Merchants to handle Sam's Club requirements for packaging and shipping. Martin negotiated and contracted with Merchants to pay $278,000 for packaging and shipping services.

After Merchants completed the packaging and shipping under the contract, Synergy only remitted payment of $6,773. Merchants filed a breach of contract suit against Synergy in California in 2004, and was awarded a default judgment. To collect the judgment, Merchants then brought an action in California to pierce Synergy's corporate veil using an alter ego theory against Martin six years later. The California court dismissed the alter ego action for lack of personal jurisdiction over Martin. Merchants then filed this action against Martin in Texas. After a bench trial, the trial court found in favor of Merchants, and now Martin appeals.

## II. Barred by Statute

Martin argues that because the California court granted Martin's motion to quash the service of process for lack of personal jurisdiction, this action is barred in Texas. Martin argues Texas law bars this action because the California court barred the action in California. Martin further argues he cannot be "bound by a judgment in personam resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process."

We must first determine if this action is barred by Texas law. Martin contends that because Merchants brought suit against him in California to enforce the Synergy judgment and

the California court found that it lacked jurisdiction over Martin, the same suit would be barred in California and is consequently now barred in Texas. The statute on which Martin relies states, an "action on a foreign judgment is barred in this state if the action is barred under the laws of the jurisdiction where rendered." TEX. CIV. PRAC. & REM. CODE ANN. § 16.066(a) (West 2008).

We review questions of statutory construction de novo. *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389 (Tex. 2014). When the statute is clear and unambiguous, we read the language according to its common meaning "without resort to rules of construction or extrinsic aids." *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). "The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to an absurd result." *Altus Brands II, LLC v. Alexander*, 435 S.W.3d 432, 440 (Tex. App.—Dallas 2014, no pet.) (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008)).

Merchants brought suit against Martin in California seeking a declaration that Martin was Synergy's alter ego. Martin filed a special appearance and motion to quash service of process for lack of personal jurisdiction which the trial court granted.[2] However, it is a well-settled rule that a court's judgment for lack of jurisdiction does not bar the plaintiff from bringing the action in another court having jurisdiction. *See GMS Props., Inc. v. Superior Court*, 33 Cal. Rptr. 163, 169 (Cal. Ct. App. 1963) (quoting E.H. Schopler, *Res Judicata Effect of Judgment Dismissing Action, or Otherwise Denying Relief, for Lack of Jurisdiction or Venue*, 49 A.L.R.2d 1040 (1956)). This action is not barred in California because a California judgment for lack of jurisdiction does not

---

[2] We note, the record does not contain the official court reporter's trial transcript from the California proceedings. However, it does contain a copy of a document entitled "Nature of Proceedings" date stamped as "Minutes Entered 10/27/10 County Clerk" which states,

> Matters are called for hearing. The Court issues its oral tentative as fully reflected in the notes of the official court reporter this date, incorporated herein by reference. The Court, having read and considered all papers filed and heard argument, rules as follows: Specially Appearing Defendant's Evidentiary Objections are OVERRULED as to item nos. 1-7. Defendant Louis Martin, Jr.'s motion to quash summons for lack of personal jurisdiction is GRANTED. The Court's ruling is more fully reflected in the notes of the official court reporter this date, incorporated herein by reference.

bar the plaintiff from bringing the action in another court that does have jurisdiction. *See GMS Props.*, 33 Cal. Rptr. at 169. We therefore, conclude this action is not barred in Texas under section 16.066(a) of the civil practice and remedies code.

Martin also relies on *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969), for the proposition that a party cannot be bound by a foreign judgment when that party was not designated as a party in that suit. We agree that the "consistent constitutional rule has been that a court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant." *Id.* (citing *Pennoyer v. Neff*, 95 U.S. 714 (1878)). While we agree with this statement of law, the facts in *Zenith* are distinguishable.

In *Zenith*, a district court in Illinois relied on the parties' pre-trial stipulation that Hazeltine Research, Inc. (HRI) and Hazeltine Corporation (Hazeltine) were considered one entity for purposes of the litigation. 395 U.S. at 107. HRI was an Illinois corporation and wholly owned subsidiary of Hazeltine, which was a New York corporation. HRI was the named respondent in the litigation, and Hazeltine was not named as a party in the suit. Hazeltine did not make an appearance in the litigation until Zenith proposed that judgment be entered against it, at which time Hazeltine filed a special appearance. Hazeltine did not formally participate in the proceedings until after the district court had entered its initial findings of fact and conclusions of law. Relying on the pre-trial stipulation made by the parties to the suit, the district court entered judgments for damages and injunctive relief against Hazeltine as well as against the named counter-defendant, HRI. *Id.* On appeal, the court of appeals vacated the district court's judgment, holding that Hazeltine could not be bound by a judgment resulting from litigation in which it was not designated as a party or to which it had not been made a party by service of process. *Id.* at 110. Hazeltine was not a named party, was never served, and did not formally

appear at the trial. The stipulation represented HRI's agreement to be bound by, and to be liable for, the acts of its parent and was signed by HRI, not Hazeltine. *Id*. The Supreme Court stated:

> If the alter ego issue had been litigated, and if the trial court had decided that HRI and Hazeltine were one and the same entity and that jurisdiction over HRI gave the court jurisdiction over Hazeltine, perhaps Hazeltine's appearance before judgment with full opportunity to contest jurisdiction would warrant entry of judgment against it. But that is not what occurred here. The trial court's judgment against Hazeltine was based wholly on HRI's stipulation. HRI may have executed the stipulation to avoid litigating the alter ego issue, but this fact cannot foreclose Hazeltine, which has never had its day in court on the question of whether it and its subsidiary should be considered the same entity for purposes of this litigation.

*Id*. at 111. In the case at bar, the California court entered a judgment against Synergy–and Synergy alone–not Martin. Unlike in *Zenith*, however, Martin does not complain about the opportunity to participate in the proceeding in California nor the proceeding in Texas below.[3] In fact, Martin did participate in the California proceeding long enough to be dismissed for lack of personal jurisdiction. As for the Texas proceeding below, Martin was the only named respondent and he does not complain to this court about a lack of service of process.

Here, Martin wants to expand *Zenith* to mean a separate proceeding to pierce the corporate veil can never be brought against a litigant if the litigant was not represented when the corporation was originally found liable. We decline to interpret *Zenith* so broadly. The parties in *Zenith* were not, as here, trying to pierce a corporate veil. Accordingly, *Zenith* does not support Martin's argument that Merchants is barred from bringing this action against him in Texas.

We decide Martin's first issue against him.

### III. Barred by Collateral Estoppel

Martin argues this suit is barred by collateral estoppel because Merchants litigated and lost the same claim in California. Martin contends the alter ego issue presented in the trial below

---

[3] Martin does contend the alter ego issue was litigated in California. However, Martin failed to provide this Court with an official reporter's record from the California proceedings so that is not a determination we can make. We further note that Martin does not challenge the validity of the Synergy judgment.

was identical to the one presented in California: it required the same proof, the same evidentiary standard, the same evidence, and the same legal arguments.

Both parties agree we apply California law to determine the effect of the California judgment. *See Centre Equities, Inc. v. Tingley*, 106 S.W.3d 143, 150 (Tex. App.—Austin 2003, no pet.). Under California law, the doctrine of collateral estoppel is well established:

> Traditionally, we have applied the doctrine only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

*Gikas v. Zolin*, 6 Cal. 4th 841, 849 (Cal. 1993).

The party asserting collateral estoppel bears the burden of establishing these requirements. *Esparza v. Cnty. of Los Angeles*, 168 Cal. Rptr. 3d 482, 492 (Cal. Ct. App. 2014). California requires "every estoppel must be certain to every intent, and not to be taken by argument or inference." *Kemp Bros. Const., Inc. v. Titan Elec. Corp.*, 53 Cal. Rptr. 3d 673, 679 (Cal. Ct. App. 2007).

The record does not contain the official court reporter's record of the October 27, 2010 hearing in California. Further, the one-page summary of the hearing that is provided to this Court states, "[t]he Court's ruling is more fully reflected in the notes of the official court reporter this date, incorporated herein by reference." Martin argues the pleadings should be enough for this Court to determine the same issues were litigated. However, nothing in the record supports an inference, much less a conclusion, that the California court decided if Merchants could pierce the corporate veil of Synergy.[4] There is simply no basis for concluding the parties fully and fairly

---

[4] We note that Martin's appellate brief included two pages of purported quotes from the California trial judge explaining her ruling, but the official reporter's record was not provided for our review.

litigated the issue of piercing the corporate veil. *See Kemp*, 53 Cal. Rptr. 3d at 675. Without the official reporter's record, we cannot review whether or not the issues were identical or actually litigated, and consequently, we cannot conclude collateral estoppel bars these proceedings in Texas. We decide Martin's second issue against him.

## IV. Sufficiency of the Evidence

In his last two issues, Martin challenges the legal and factual sufficiency of the evidence that Martin caused the corporation to perpetrate a fraud and that he engaged in "actual fraud." The trial court's conclusions of law found "Martin engaged in conduct constituting 'actual fraud' . . . by at the outset of the relationship, making false and misleading representations to Merchants . . . "; "Martin deceptively represented and misrepresented Synergy's financial inability to pay Merchants for the services Merchants provided"; and "Martin, acting in his capacity as an officer and stockholder of Synergy, misused Synergy's corporate fiction to defraud Merchants and evade a legitimate obligation for Martin's personal benefit."

In a legal sufficiency review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.*, 168 S.W.3d at 827. We cannot substitute our judgment for that of the trier of fact, so long as the evidence falls within this zone of reasonable disagreement. *Id.*, 168 S.W.3d at 822.

Findings of fact in a case tried to the court have the same force and effect as jury findings and are reviewed by the same standards used to review challenges to the sufficiency of the evidence to support jury findings. *Altus*, 435 S.W.3d at 440. In our factual sufficiency review, we consider all the evidence, setting aside the finding only if the evidence supporting the finding is so weak or so against the great weight and preponderance of the evidence that the finding is

–7–

clearly wrong and unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). As fact-finder in a bench trial, the trial court is the sole judge of the credibility of the witnesses. *Altus*, 435 S.W.3d at 440.

We have traditionally applied the alter ego doctrine to pierce the corporate veil when there is a "unity between the corporation and the individual to the extent that the corporation's separateness has ceased, and holding only the corporation liable would be unjust." *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986). However, the issue of alter ego has been codified to a substantial degree. *See Latham v. Burgher*, 320 S.W.3d 602, 608 (Tex. App.—Dallas 2010, no pet.). The statute states in relevant part,

> (a) A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to:
> * * *
>> (2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory;
>> * * *
> (b) Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

TEX. BUS. ORGS. CODE ANN. § 21.223 (West 2012). In the context of piercing the corporate veil, actual fraud is not equivalent to the tort of fraud. In the piercing of the corporate veil, actual fraud involves "dishonesty of purpose or intent to deceive." *Latham*, 320 S.W.3d at 607 (citing *Castleberry,* 721 S.W.2d at 273; *Priddy v. Rawson*, 282 S.W.3d 588 (Tex. App.—Houston [14th Dist.] 2009, pet. den.); *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 387 (Tex.App.—Houston [14th Dist.] 2007, no pet.)).

Martin argues specifically that the evidence was legally and factually insufficient to show that "Martin caused Synergy to do anything about the payment of Merchants, much less perpetrate a fraud." We disagree.

Martin bases his arguments on the theory that he was a "sales representative" with no control over the corporation. However, the record shows Martin and Chuck Clark, together as business partners, formed, operated, and were officers in no less than thirteen different companies between 2002 and 2012. Ten of these companies were formed and administratively dissolved between August 2002 to September 2007. Clearly, as a founding shareholder and officer of these corporations, Martin had some control over the actions taken by these businesses. Martin owned 50% interest in AOS, Inc., a nominee entity created to be a corporate shareholder of Synergy, Inc. AOS held either 50% or 66.7% ownership interest of Synergy; there is conflicting evidence as to the exact percentage of ownership held by AOS. Both Synergy and AOS had allowed their corporate charters to lapse and both also filed for reinstatement around the time Synergy contracted with Merchants.

Synergy was incorporated in the State of Florida on August 22, 2002 and thereafter forfeited its corporate charter. On September 5, 2003, a Corporation Reinstatement form was filed with the Florida Secretary of State's office for reinstatement of Synergy's charter. AOS was incorporated in the State of Florida in April 2002 and thereafter forfeited its corporate charter. On September 22, 2003, a Corporation Reinstatement form was filed with the Florida Secretary of State's office for reinstatement of AOS' charter.

Douglas Farrell, director of sales for Merchants, testified that he only dealt with Martin during negotiations on the "TurboFlare 360" transactions with Synergy. When negotiating with Merchants, Martin represented verbally and in writing that he was the "CEO" of Synergy. Farrell testified that "the fact that we were dealing with the person in charge of the company, a person

that with whatever representations they might make, would have the final say in the matter and that their word was binding and bound the company to, you know, obligations for the transaction." At trial, Martin admitted that he was not the CEO of Synergy and that it would be "false" if he had in fact represented himself to be the CEO of Synergy while soliciting business from Merchants.

After Merchants gave Martin a quote for the Sam's deal, Martin called Farrell to negotiate better terms. During the call, Martin represented that Synergy had a thin profit margin; the initial pricing Farrell offered to them almost made them unable to do the program; and Synergy needed reduced pricing. Farrell conferred with the president of Merchants who agreed to the reduced pricing but required information regarding Synergy's ability to pay for the services. Farrell went back to Martin and directly asked him, "Mr. Martin, are you able to pay this bill?" Farrell recounted Martin's response:

> But I recall him taking the question rather lightly. And he kind of chuckled. He said, oh, you don't need to worry about our creditworthiness or our ability to make payment. We certainly -- we certainly are able to pay. Money is not an issue. We have the money in reserves and assets to make payment and I personally assure you that you will get paid. Please don't worry.

During trial, Martin testified Synergy's margin for the Sam's deal was actually between 25% and 50% on the final terms.

Martin personally assured Farrell that: 1) Martin would oversee the transactions between Merchants and Synergy, 2) Synergy was financially strong and had sufficient revenue and assets to pay the anticipated charges by Merchants, 3) Synergy would promptly pay Merchants for the work, and 4) Merchants had Martin's "personal assurance" that the debt would be paid. Farrell's account of these facts was uncontroverted by Martin.

Farrell testified that Martin's representations about Synergy's finances and personal assurances of payment were material to Merchants' decision to extend credit to Synergy. Martin

never denied making the critical representations relating to himself and Synergy's purported financial status. Martin never told Farrell that he did not have the authority to pay Merchant's bill without the approval of Chuck Clark. In fact, Farrell did not hear the name "Chuck Clark" until discovery in this lawsuit.

After Merchants completed their part of the contract with Synergy and had sent numerous invoices to Synergy totaling $278,452, Synergy only remitted payment of $6,773. Martin blamed Clark, claiming Clark controlled all financial matters. Martin testified that Clark maintained the company checkbook in his office, and Clark "handled all the accounts payable, all the accounts receivable, all the invoicing, all the tax returns, all accounting issues, all payroll, and most of the major decisions." It was also established at trial that Martin never asked Clark to see the books or financials. However, on February 17, 2004, in response to a Merchants' email inquiring about payment status of the past-due invoices, Martin stated,

> I apologize for the delay in payment. I certainly understand your desire to collect what is owed as I feel the same way about all of our accounts. I was expecting to receive full payment from Sam's Club by this time, but we have not yet received this. As S.D.G. is a smaller company, we are unfortunately unable to make payment on these invoices until we receive the income from Sam's Club. Again, my apologies for this delay. Hopefully, we will be receiving final payment from Sam's in the next couple of weeks. As soon as we do, all monies owed to U.S. Merchants will be paid in full. I appreciate your continued patience, I will let you know as soon as payment is sent.

So again, Martin represented that he was aware of the financial situation of Synergy. This statement was further shown to be deceptive because according to Synergy's general ledger and check register, during the 34-day period immediately preceding Martin's sending of this email, Synergy made significant cash deposits totaling $864,051.95, including a $232,575.33 cash deposit noted as "Sam's payment" on January 15, 2004 and a $631,476.62 cash deposit from "Sales" on February 12, 2004. Martin never told Farrell that Synergy received full payment from Sam's Club.

Further, Synergy's records reveal payments made between January 20, 2004 and February 12, 2004, listed as shareholder liabilities totaling $454,912.35, including a payment of $244,912.35 specifically to AOS and $180,000 directly to Martin. Even though Martin blamed Clark and complains Clark controlled and represented the financial status of Synergy, Martin's personal checking account records reflect a deposit in the amount of $207,000 on February 23, 2004, so Martin was aware Synergy had funds available.

Merchants offered testimony from John Golle, who had prior business dealings with Martin and Synergy. Golle testified Martin and Clark used Synergy as a corporate shell to avoid payment of a large debt, which was litigated to judgment, and remains outstanding and unpaid. Golle produced financial records of Synergy that were obtained during his litigation with Synergy, and maintained in his company's business records. Merchants obtained those records from Golle when, after being ordered by the court to obtains Synergy's financial records from Clark, Martin claimed that he could not produce any of Synergy's financial records because they had all been "blown away in a hurricane." Golle testified, "all of my interaction [with Synergy] was with Mr. Martin, not Mr. Clark."

Since Martin was an originating officer of AOS and wholly negotiated the contract with Merchants, a reasonable and fair-minded person could determine Martin had sufficient control of Synergy's operations. Because Martin approached and misrepresented himself to Farrell, personally enjoyed the financial benefit from the completion of the Sam's deal, and repeatedly falsely represented to Merchants that they would be paid, a reasonable and fair-minded person could have concluded Martin exhibited "dishonesty of purpose or intent to deceive." *See Latham*, 320 S.W.3d at 607. This evidence showed Synergy was used to achieve an inequitable result. A corporation's limitation on liability can be ignored only "when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *Latham*, 320 S.W.3d at 610

(citing *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2008)). We conclude viewing the evidence in the light most favorable to the verdict and considering all of the evidence in a neutral light both lead to the same result: the evidence is sufficient to support the trial court's finding that Martin engaged in conduct constituting actual fraud. We decide Martin's third issue against him.

## V. Conclusion

Having decided Martin's issues against him, we affirm the judgment of the trial court.


/Lana Myers/
LANA MYERS
JUSTICE

130999F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

LOUIS MARTIN, JR., Appellant

No. 05-13-00999-CV          V.

U.S. MERCHANTS FINANCIAL GROUP, INC., Appellee

On Appeal from the 134th Judicial District Court, Dallas County, Texas
Trial Court Cause No. 10-15757.
Opinion delivered by Justice Myers. Justice Francis participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee U.S. MERCHANTS FINANCIAL GROUP, INC. recover its costs of this appeal from appellant LOUIS MARTIN, JR..

Judgment entered this 8th day of December, 2014.