COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| TRANSPECOS BANKS, | § | No. 08-14-00059-CV |
| Appellant, | § | Appeal from the |
| v. | § | 143rd District Court |
| JODI STROBACH, | § | of Reeves County, Texas |
| Appellee. | § | (TC # 12-10-20243-CVR) |
| | § | |

## O P I N I O N

TransPecos Banks sued Jodi Strobach alleging she was personally liable on a 2003 loan the Bank had made to a corporation Strobach had formed and of which she was the president and sole shareholder. The trial court granted Strobach's motion for directed verdict during trial, and entered a take-nothing judgment on the Bank's claims. We conclude Strobach could not be held personally liable for the corporate debt, because the Bank failed to raise a fact issue that Strobach committed an actual fraud on the Bank when she obtained the 2003 loan on the corporation's behalf. Accordingly, we affirm.

### BACKGROUND

### Strobach Pledges her Land as Collateral for her Father's Loans

The Bank made a series of loans to Strobach's father, Roger Jones. The first loan was

made to Jones in 1998 solely in his individual capacity. As collateral for the 1998 loan, Strobach executed a deed of trust to the Bank on a 220-acre tract of farm land she owned. As part of the security agreement for the 1998 loan, Strobach assigned the Bank the right to receive certain farm subsidy payments associated with the land from the United States Department of Agriculture, which included conservation reserve payments (CRP).

The Bank made a second loan to Jones in March 2000, this time in the name of "Roger W. Jones, Jr. DBA Jones Farms." That loan was secured in part by the same 1998 deed of trust covering the 220-acre tract of land that the Bank had previously accepted as security for Jones's 1998 loan. In August of 2001, the Bank made a third loan to Jones, again as "Roger Jones D/B/A Jones Farms." The 2001 loan was secured by a separate deed of trust, signed by both Jones and Strobach, deeding to the Bank six tracts of land, including the original 220-acre tract of land referenced in the 1998 deed of trust. The 2001 deed of trust expressly referenced the 1998 deed of trust and recited that all six tracts of land were subject to various deeds of trust that Jones had previously made for the benefit of the Small Business Administration, the Farmers Home Administration, and the Farm Credit Bank of Texas.

**The Bank Suggests that Strobach Form a Corporation to Help Refinance Jones's Loans**

According to both Jones and Strobach, when Jones fell behind on his loan payments in 2003, a Bank representative, Joseph Keese, agreed to a two-step plan to refinance Jones's various loans. The first step was to have Strobach form a corporation into which she would transfer the original 220-acre tract of land included in both the 1998 and 2001 deeds of trust, along with two other tracts of land she owned, both of which were included in the 2001 deed of trust. The second step was to have the corporation obtain a loan from the Bank, secured by those three tracts of land

2

and by the USDA farm subsidy payments associated with the land. Jones testified that the Bank was responsible for devising the plan, and that the Bank contacted Strobach to ask her to form the corporation as part of the plan. Strobach testified that the Bank prepared all of the documents for her signature, including the warranty deed that she utilized to transfer the three tracts of land to the corporation, explaining that she simply showed up to sign the documents as requested by her father and the Bank. The Bank presented no contrary evidence. Instead, the only Bank representative to testify at trial—the Bank's current president Marshall Coker—acknowledged that he was not affiliated with the Bank when the 2003 transaction took place and had no personal knowledge of what had occurred at that time.

Strobach filed Articles of Incorporation with the Texas Secretary of State in February 2003, forming a close corporation known as Jones-Strobach Farms, Inc. (the JSF Corporation). Strobach and Jones were named directors of the JSF Corporation, with Strobach serving as president, and Jones serving as treasurer and as the registered agent. Strobach maintained 100 percent ownership and control of the JSF Corporation, and Jones had no involvement in the Corporation after it was formed.

The Articles of Incorporation stated that the JSF Corporation had the authority to issue 100,000 shares of stock, valued at $1 per share, and that the Corporation would not commence business until it had received consideration for the issuance of the shares in the form of "money, labor done or property" valued at $1,000. A few days after filing the Articles of Incorporation, Strobach signed a warranty deed transferring her interest in the three tracts of land to the JSF Corporation. Strobach testified that although she did not know the exact value of the land at the time of the transfer, she believed they were valued at more than $1,000, even taking into

3

consideration the land's pre-existing encumbrances. The Bank did not present any evidence to establish the value of the land in 2003, with or without the existing encumbrances.

**The Bank Makes New Loans to the Corporation and Jones**

Shortly thereafter, on March 10, 2003, the Bank made two loans of $160,000 each, one to the JSF Corporation and the other to "Roger Jones D/B/A Jones Farms." The promissory note on the JSF Corporation's loan, which was signed by Strobach in her capacity as the Corporation's president, was made payable in seven annual payments of $19,018 each, beginning in October 2003, with a balloon payment of $106,616.76 due in October 2010 on the scheduled maturity date of the note. The promissory notes stated that the purpose of both loans was to "refinance debt to coincide with land ownership and CRP payments." At trial, both parties agreed that the debt to be refinanced was the debt that Jones still owed to the Bank for his prior loans.

Strobach signed a deed of trust in her capacity as the Corporation's president, pledging to the Bank the three tracts of land now owned by the Corporation as security for the JSF Corporation's loan. Shortly thereafter, on March 13, 2003, Strobach signed a security agreement, again as the Corporation's president, pledging to the Bank all of the USDA farm subsidy payments associated with the three tracts of land. In furtherance of the security agreement, the JSF Corporation filed an assignment form with the USDA, which assigned to the Bank its rights to the CRP payments from the USDA, in the total amount of $152,144, with payments of $19,018 annually to be made to the Bank through 2010. These annual payments apparently served to fulfill the JSF Corporation's annual payment obligations under the terms of its 2003 promissory note for that seven-year period. Around the same time, the JSF Corporation also filed an assignment form with the USDA, assigning to the Bank its rights to the "direct and

4

counter-cyclical payments" from the USDA (the cyclical payments), in the total amount of $360,600, with annual payments of $60,100 to be paid directly to the Bank for four years through 2007. These annual payments apparently served to fulfill Jones's payment obligations under the terms of his 2003 promissory note to the Bank.

**The Default Proceedings**

The record reflects that both of the 2003 loans were kept current at least through 2007 through the Bank's receipt of the USDA farm subsidy payments. According to Coker, problems arose in 2008, when the USDA payments stopped on Jones's 2003 loan. Although the record is not entirely clear, it appears that the last annual cyclical payment was made to the Bank in 2007 on Jones's 2003 loan in accordance with the assignment, but that Jones thereafter failed to make any additional payments on his loan, causing it to go into default.

After the Bank declared Jones's loans in default, the Bank held a foreclosure sale in May 2008, and foreclosed on the 1998 and 2001 deeds of trust that secured those loans. At the foreclosure sale, the Bank purchased all six tracts of land that had been deeded to the Bank for a total purchase price of $550,211.84. The Bank's purchase included the three tracts of land owned by the JSF Corporation, which had been included in the 2001 deed of trust to secure Jones's prior loans, as well in the 2003 deed of trust that was securing the Corporation's 2003 loan.

Because the Corporation's 2003 deed of trust was in a junior position to the 1998 and 2001 deeds of trust, the foreclosure sale effectively extinguished that 2003 deed. In addition, the Bank's purchase of the Corporation's three tracts of land at the foreclosure sale included the purchase of the right to receive the CRP payments that had been financing the Corporation's loan. Therefore, although the Corporation had previously been current on its loan obligations through

5

the use of those CRP payments, the Bank's purchase effectively left the Corporation with no assets and no source of income from which it could meet its obligations under the terms of the Corporation's promissory note to the Bank.

After the foreclosure sale, the Bank sent two written notices to the JSF Corporation, addressed to Strobach as President of the Corporation, warning that the Corporation's loan was now unsecured due to the foreclosure sale, and that the Bank considered the loan in default. The Bank offered the Corporation the opportunity to cure the default by pledging additional collateral to secure the loan, and warned that if the Bank did not receive additional sufficient collateral, it would accelerate the note and demand payment in full. The Corporation did not respond to the notices or to provide any additional collateral to secure the note. In December 2008, the Bank sent one last notice to the JSF Corporation, this time addressed to Jones as the Corporation's registered agent, advising that the Corporation's 2003 loan was in default and that approximately $31,000 was due and owing on the loan. The Bank received no response from the Corporation.[1]

Sometime after sending the notices, the Bank learned that the Texas Secretary of State had revoked the JSF Corporation's charter in 2005 for failure to pay its franchise taxes.[2]

**The Bank Sues and Obtains a Judgment Against Jones**

In December 2008, the Bank filed a lawsuit against both Jones and Strobach, in their individual capacities, seeking to recoup the deficiencies that still existed after the foreclosure sale

---

[1] The Bank sent all three notices to the P.O. Box address that Strobach had provided in the documents for the 2003 loan transaction. At trial, Jones testified that this was his home address and Strobach testified that the address was still current in 2008 when the Bank sent its notices to the Corporation. However, both Strobach and Jones testified that they never received any notices from the Bank regarding the status of the Corporation's loan. Therefore, both of them claimed to have been unaware of the Bank's efforts to resolve the issues with the loan at that time.

[2] Jones testified that he had not been aware that the Corporation's charter had been revoked in 2005, claiming that he never received any notices from the Secretary of State. Although Strobach acknowledged that the Corporation's charter had been revoked in 2005, she did not provide any indication of how or when she learned about the revocation.

with respect to both the 2003 loan to the JSF Corporation and the 2003 loan to Jones. In April 2010, the Bank obtained a judgment against Jones, receiving damages totaling over $260,000 for the amounts still owed on Jones's 2003 loan and another loan made in 2006.[3] However, because the Bank was unable to serve Strobach, no judgment was entered against her with regard to the JSF Corporation's 2003 loan.

### The Bank Sues Strobach

The Bank filed the present lawsuit against Strobach in October 2012, attempting to hold her personally liable for the balance owed on the JSF Corporation's 2003 loan. Both parties agreed that Strobach had signed the promissory note for the Corporation's 2003 loan solely on behalf of the Corporation's as the Corporation's president, and that she did not intend to be personally liable on the loan. Instead, the parties agreed that Strobach could be held personally liable for the Corporation's obligations under the promissory note only if a jury found that she had used the Corporation to perpetrate an actual fraud on the Bank for her own direct personal benefit.

The Bank's theory of liability was that Strobach had fraudulently formed the JSF Corporation as a sham corporation with "valueless" assets in order to wrongfully obtain the 2003 loan from the Bank, with no intention of repaying the loan and with the sole intent of avoiding any personal liability to the Bank. The Bank further claimed that when Strobach signed the 2003 promissory note on the Corporation's behalf, she knew that the Corporation would be defunct by the time the note matured, and that she had no intention of maintaining the Corporation's existence to ensure that it repaid the loan in full, as evidenced by her failure to pay the franchise taxes, her

---

[3] The Bank also sued on a $60,000 loan it had made in November 2006 to a separate corporation formed by Jones, known as Pecos Farmers Produce Inc. (Pecos Farmers), which Jones had personally guaranteed. Although it is unclear when this occurred, it appears that Pecos Farmers also lost its corporate charter sometime after the Bank made the 2006 loan to it.

failure to adhere to any corporate formalities, and her failure to maintain the Corporation's charter.

At the close of the Bank's evidence, Strobach moved for a directed verdict, asserting that that she could not be held personally liable for the Corporation's obligations on that loan because there was no evidence to establish that she had engaged in any fraudulent conduct that inured to her personal benefit in obtaining the 2003 loan on the Corporation's behalf. The trial court granted Strobach's motion for directed verdict and entered a take-nothing judgment in favor of Strobach. This appeal followed.

## DISCUSSION

In its sole point of error, the Bank contends the trial court erred in granting directed verdict, asserting that it presented sufficient evidence to raise a fact issue that Strobach committed an actual fraud on the Bank for her own direct, personal benefit when she obtained the 2003 loan from the Bank on the Corporation's behalf.

### Standard of Review

A directed verdict may be properly granted when there is no evidence presented at trial to support a material issue in the suit. *Calvillo v. Carrington Mortgage Servs.*, __ S.W.3d ___, 2015 WL 7730992, at *2-3 (Tex.App. – El Paso Nov. 30, 2015, no. pet. h.). In reviewing a directed verdict, an appellate court examines the evidence in the light most favorable to the party suffering the adverse judgment. *Id.*, at *3. The appellate court must review the entire record to determine whether there is more than a scintilla of evidence that a fact question existed that would have rendered the order improper. *Id.* To meet the "more than a scintilla" threshold, evidence must demonstrate more than surmise or suspicion that a fact question exists. *Id.*

### Holding a Corporate Affiliate Personally Liable for a Corporate Debt

8

A corporation is a separate legal entity from its shareholders, officers, and directors. *See Penhollow Custom Homes, LLC v. Kim,* 320 S.W.3d 366, 372 (Tex.App. – El Paso 2010, no pet.). A fundamental principle of corporate law is that an individual is permitted to incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations. *Id.* Under the common law, when the corporation's owner, shareholder, director, or other affiliate (collectively referred to as a "corporate affiliate") has used the corporate form "as part of a basically unfair device to achieve an inequitable result," courts have been willing to disregard the corporate structure and have allowed a corporate obligee to hold a corporate affiliate personally liable for the corporation's obligations. *See, e.g., Castleberry v. Branscum,* 721 S.W.2d 270, 271 (Tex. 1986). One method at common law that a corporate obligee could use to disregard the corporate structure was to establish that the corporate affiliate used the corporation as an "alter-ego" for his own personal use. The corporation's obligee could attempt to establish that there was "such unity between corporation and [the corporate affiliate] that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *Id.* at 272. This common law alter ego doctrine was "shown from the total dealings of the corporation and the [affiliate], including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the [affiliate] maintains over the corporation, and whether the corporation has been used for personal purposes." *Id.*

The Legislature, however, eliminated the alter ego theory as a basis for disregarding the corporate structure when it adopted what is now Section 21.223 of the Texas Business

9

Organizations Code.[4]   Section 21.223 provides that a shareholder or owner "may not be held liable to the corporation or its obligees with respect to . . . any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder . . . is or *was the alter ego of the corporation* or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory[.]"   TEX. BUS. ORGS. CODE ANN. § 21.223(a)(2) (West 2012) (emphasis added).   The Legislature expressly determined that the failure to adhere to corporate formalities is no longer considered a valid basis for disregarding the corporate structure. In particular, Section 21.223 provides that an individual shareholder or owner may *not* be held liable for a corporation's obligations "on the basis of the failure of the corporation to observe any corporate formality, including the failure to:   (A) comply with this code or the certificate of formation or bylaws of the corporation; or (B) observe any requirement prescribed by this code or the certificate of formation or bylaws of the corporation for acts to be taken by the corporation or its directors or shareholders."[5]   *Id.* at § 21.223(a)(3); *see also Penhollow Custom Homes, LLC,* 320 S.W.3d at 372 (recognizing that "the failure of a corporation to observe any corporate

---

[4]  Initially, this provision was found in Article 2.21 of the Texas Business Corporations Act.   In 2006, the Legislature reorganized the Act into what is now the Texas Business Organizations Code and utilized the same language in Section 21.223 as it did in Article 2.21 with regard to the requirements for disregarding the corporate structure.   *SSP Partners v. Gladstrong Invs. (USA) Corp.,* 275 S.W.3d 444, 456 n.57 (Tex. 2008) (noting that article 2.21 was "recodified in substantially similar form in TEX. BUS. ORGS. CODE § 2.223, and §§ 21.224–.225, respectively. Act of May 29, 2003, 78th Leg., R.S., ch. 182, §§ 1, 2, 2003 Tex. Gen. Laws 267, 427, 595"); *see also Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 507 (Tex.App. – Houston [1st Dist.] 2012, pet. dism'd) (discussing Legislative history of the two provisions).   Our analysis will therefore rely on opinions that were decided under both Article 2.21 and Section 21.223, as the analysis in both instances will necessarily be the same given the identical language used in the two provisions.

[5]  The Legislature expressly applied this same principle to close corporations.   TEX. BUS. ORGS. CODE ANN. § 21.730 (West 2012) (the "failure of a close corporation under this subchapter to observe a usual formality or requirement prescribed for an ordinary corporation by this chapter relating to the exercise of corporate powers or the management of a corporation's business and affairs and the performance of a shareholders' agreement that treats the close corporation as if the corporation were a partnership or in a manner that otherwise is appropriate only among partners may not: (1) be a factor in determining whether to impose personal liability on the shareholders for the close corporation's obligations by disregarding the separate entity of the close corporation or otherwise. . .").

formality is no longer a factor in considering whether alter ego exists").

Instead, the Legislature stated that a corporate affiliate may be held liable for a corporation's obligations only if the "obligee demonstrates that the . . . affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate." TEX. BUS. ORGS. CODE ANN. § 21.223(b). The Legislature expressly stated that it intended for this to be the *sole* method for holding a corporate affiliate personally liable, as evidenced by its enactment of Section 21.224, which provides that, "[t]he liability of a holder, beneficial owner, or subscriber of shares of a corporation, or any affiliate of such a holder, owner, or subscriber or of the corporation, for an obligation that is limited by Section 21.223 is exclusive and preempts any other liability imposed for that obligation under common law or otherwise."[6] *Id*. at § 21.224; *see also Willis v. Donnelly*, 199 S.W.3d 262, 272 (Tex. 2006) (recognizing that the Legislature has "narrowly prescribed the circumstances under which a shareholder can be held liable for corporate debts"); *Weaver & Tidwell, L.L.P. v. Guarantee Co. of N. Am. USA,* 427 S.W.3d 559, 574-75 (Tex.App. – Dallas 2014, pet. denied) (recognizing that Section 21.223 is currently the only method available for holding an affiliate liable for a corporation's contractual obligations); *Farr v. Sun World Sav. Ass'n,* 810 S.W.2d 294, 295-96 (Tex.App. – El Paso 1991, no writ) (recognizing that common law principles for disregarding the corporate structure are no longer applicable in light of the Legislature's pronouncement that only a finding of actual fraud

---

[6] The only exception to this limitation is found in Section 21.225 of the Code, which provides that a corporate affiliate may be found personally liable to the corporation's obligee if the affiliate "expressly assumes, guarantees, or agrees to be personally liable to the obligee for the obligation[.]" TEX. BUS. ORGS. CODE ANN. § 21.225 (West 2012). As set forth above, the Bank conceded at trial that Strobach did not expressly assume, guarantee, or agree to be liable to the Bank for the 2003 loan, and instead acknowledged that she only signed the 2003 promissory note in her capacity as the Corporation's president.

suffices to hold a corporation's owner or shareholder personally liable for the corporation's obligations).

The Legislature, however, did not provide a definition of the term "actual fraud" when it enacted Section 21.223. In determining the Legislature's intent in using that term, courts have typically referred to the language used by the Texas Supreme Court in *Castleberry*, in which the Court contrasted the definition of actual fraud with the definition of constructive fraud in the following passage:

> Actual fraud usually involves dishonesty of purpose or intent to deceive, whereas constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests.

*Castleberry,* 721 S.W.2d at 273.[7] Thus, relying on the language in *Castleberry*, this Court has, along with several of our sister courts, recognized that the actual fraud requirement in the Code involves "dishonesty of purpose or intent to deceive[.]" *See, e.g., Farr,* 810 S.W.2d at 296; *see also Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex.App. – Dallas 2010, no pet.); *Priddy v. Rawson,* 282 S.W.3d 588, 600 (Tex.App. – Houston [14th Dist.] 2009, pet. denied); *Dick's Last Resort of W. End, Inc. v. Mkt./Ross, Ltd.,* 273 S.W.3d 905, 909 (Tex.App. – Dallas 2008, pet. denied); *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.,* 237 S.W.3d 379, 387 (Tex.App. – Houston [14th Dist.] 2007, no pet.); *Menetti v. Chavers,* 974 S.W.2d 168, 174 (Tex.App. – San Antonio 1998, no pet.).

We have also recognized that in adopting Section 21.223(b), the Legislature expressly

---

[7] *Castleberry* held that under the common law, a corporate affiliate could be held personally liable for a corporation's obligations, based on a finding that the affiliate engaged in either "actual fraud" or "constructive fraud." *Castleberry*, 721 S.W.2d at 273. It was this very ruling that caused the Legislature to amend the Code to require a finding that the corporate affiliate perpetrated an actual fraud on the corporation's obligee before he could be held personally liable for the corporation's obligations. *See Farr,* 810 S.W.2d at 296; *see also SSP Partners*, 275 S.W.3d at 455.

12

placed the burden of proof on the corporate obligee to demonstrate that a corporate affiliate used the corporation to perpetrate an actual fraud on the obligee for his direct personal benefit. *See, e.g., Cass v. Stephens,* 156 S.W.3d 38, 59 (Tex.App. – El Paso 2004, pet. denied) (plaintiff had the burden of proving that the defendant perpetrated an actual fraud on the plaintiff for the defendant's own direct benefit in order to hold the defendant personally liable for the corporation's obligations); *see also Menetti,* 974 S.W.2d at 175 (plaintiff had the burden of proving that the defendant caused the corporation to perpetrate an actual fraud on her for the defendant's own direct benefit). Further, we have noted that when a corporate obligee seeks to establish that the corporate affiliate engaged in actual fraud through the use of a misrepresentation, the obligee similarly shoulders the burden of establishing the existence of the traditional elements of a misrepresentation claim, including that the affiliate engaged in a representation that was: (1) material; (2) false; (3) knowingly false or made with reckless disregard for its truth or falsity; (4) made with the intention that it be acted upon by the other party; (5) relied upon by the other party; and (6) damaging to the other party. *Cass,* 156 S.W.3d at 59.

## ANALYSIS

### The Bank Failed to Present Evidence of Actual Fraud

The Bank's argument that it presented sufficient evidence that Strobach used the JSF Corporation to perpetrate an actual fraud on the Bank, is based primarily on its claim that Strobach engaged in a "nearly infinite number of 'shams,'" in which she allegedly formed a sham or shell corporation, transferred "valueless" assets to the corporation, and then pledged those same valueless assets, in order to fraudulently extract a loan from the Bank, knowing that the assets would not be sufficient to allow the Bank to recoup its losses in the event of a default. In

13

particular, the Bank points out that the three tracts of land pledged by the JSF Corporation to secure its loan were already encumbered by pre-existing loans of over $200,000, which had been previously made in favor of the "creditors of Roger Jones, or of entities that Roger Jones owned and controlled." The Bank further complains that when Strobach obtained the loan, the Corporation had no other assets, which ultimately left the Bank with nothing to attach to fulfill the Corporation's obligations after Jones defaulted on his loans and the land was sold at the 2008 foreclosure sale. In effect, the Bank believes that Strobach used her valueless corporation to obtain the loan in order to avoid any personal liability to the Bank, and to avoid having to ever repay the loan.

In support of its argument, the Bank relies on an analogous situation faced by our sister court in *Dick's Last Resort of W. End, Inc. v. Mkt./Ross, Ltd*., 273 S.W.3d 905, 911 (Tex.App. – Dallas 2008, pet. denied). In that case, the defendant candidly admitted at trial that he engaged in a series of complex transactions over the course of several years, using various corporations that he owned, with the avowed intent to defraud the plaintiff and avoid any liability to it. Among other things, the defendant admitted that he had used one of his corporations to sign a lease agreement with the plaintiff-landlord to operate a restaurant, and then subsequently transferred that corporation's interest in the lease to another corporation he owned, without informing the landlord. After the transfer, the defendant provided false information to the landlord, making the landlord believe that the first corporation was receiving the restaurant's proceeds, in order to obtain a release of the landlord's lien on the restaurant's assets, when in fact the second corporation was actually operating the restaurant. Later, when the defendant decided to move the restaurant to another location in breach of the lease agreement, the defendant made a second transfer of the lease

14

to yet another corporation he owned, which had no assets, with the avowed purpose of defeating the landlord's ability to collect on any judgment for the breach of the lease agreement. *Id.* at 912. Based on those compelling factors, the Dallas Court of Appeals upheld the jury's verdict finding the defendant personally liable for the corporation's obligations under the lease, noting that even the defendant himself admitted at trial that he purposely used his various corporations as part of a complex scheme to avoid liability to the landlord, with the ultimate goal of leaving the landlord without "anybody to sue." *Id.* at 912-13.

There are several important distinctions between this case and the situation in *Dick's*. First, unlike the defendant in *Dick's*, Strobach never admitted at trial that she had a fraudulent intent when she signed the promissory note on the Corporation's behalf. To the contrary, Strobach testified that when she signed the promissory note, she fully intended for the loan to be repaid, and she clearly took steps to ensure that the Bank would timely receive payments on the loan by assigning the farm subsidy payments to the Bank in accordance with the promissory note. As explained above, those payments stopped only when in 2008 the Bank foreclosed on the two senior deeds of trust that were securing Jones's prior loans—events that were not caused by Strobach and were outside of her control.

Further, although the Bank contends that Strobach participated in a scheme along with her father to defraud the Bank by creating the Corporation and having the Corporation obtain the 2003 loan to help her father pay off his loans, the uncontradicted evidence at trial established that this alleged scheme was part of the very same plan that the Bank itself proposed, created, and sanctioned as a means of refinancing Jones's prior debts. In fact, as set forth above, Strobach testified at trial, without contradiction, that the Bank prepared all of the documents for her to sign

15

in furtherance of this plan, including the warranty deed that she utilized to transfer the three tracts of land to the Corporation, explaining that she simply showed up to sign the documents as requested by her father and the Bank.[8]

Further, unlike the defendant in *Dick's*, there is no evidence that Strobach made any false representations or provided any false information to the Bank that induced the Bank into making the 2003 loan to the Corporation. Although the Bank appears to be contending that Strobach somehow tricked the Bank into accepting the Corporation's pledge of the three already-encumbered tracts of land as collateral for the Corporation's 2003 loan, the uncontradicted evidence established that the Bank was fully aware of the encumbrances on all three tracts of land when it accepted the land as collateral. In fact, as explained above, the Bank had previously accepted this same land as collateral to secure Jones's prior loans, and the prior deed of trust the Bank had accepted to secure Jones's 2001 loan contained a detailed description of all of the encumbrances on the land, including the encumbrances from the Bank itself as well as from various third parties. More important, there was no evidence presented at trial to suggest that Strobach attempted to hide the nature of those encumbrances when she pledged the land to the Bank on the Corporation's behalf, or that she otherwise made any misrepresentations to the Bank regarding the value of the land. The evidence presented at trial demonstrated that the Bank was aware that it was accepting highly-encumbered land as collateral for the 2003 loan to the JSF Corporation, yet knowingly decided to accept the land as collateral despite that fact.

We also find it significant that the Bank was aware when it accepted the 2003 deed of trust as security for the Corporation's loan, that it was in a junior position to the 1998 and 2001 deeds,

---

[8] The Bank contends that Strobach should be held liable for knowingly participating in any fraud committed by her father in pursuing this scheme. We note, however, that just as the Bank failed to present any evidence that Strobach committed any fraud in the 2003 transaction, it also failed to present any evidence that Jones did so either.

which the Bank had previously accepted as collateral to secure Jones's other loans. The Bank was therefore aware of the possibility that if Jones defaulted on virtually any of his loans, these senior deeds would be foreclosed upon, which would in turn cause the domino effect of extinguishing the 2003 junior deed as well, thereby taking away the Corporation's only asset. Accordingly, the Bank knew that this would effectively topple the house of cards that the Bank itself had helped to create, leaving the Corporation's 2003 loan unsecured, and further leaving the Corporation without any other assets upon which the Bank could have executed in order to collect on any deficiencies on the loan.[9]

Moreover, there is nothing in the record to suggest that when the 2003 loan was made, Strobach made any misrepresentations that might have led the Bank to believe that the Corporation had any assets other than the three tracts of land included in the 2003 deed of trust, or that the Corporation intended to acquire any other assets in the future, which the Bank could have attached in the event of a default. And, there is nothing in the record to suggest that Strobach prevented the Bank from independently verifying the nature of the Corporation's assets or the Corporation's financial strength before it entered into the loan agreement. Instead, it appears that the Bank made the loan to the Corporation, knowing the limited and highly-encumbered nature of the Corporation's assets, and made a knowing decision to make the loan under what were admittedly risky circumstances. While we can only speculate as to the reasons for the Bank's willingness to make this admittedly risky loan to the Corporation, the fact remains that the Bank chose to make the loan with full knowledge of all relevant facts pertinent to the risk it was taking.

---

[9] The Bank also appears to be arguing that Jones was, at least in part, responsible for the alleged fraud that occurred when the Corporation obtained the 2003 loan, and that Jones's fraud should be imputed to Strobach. There is no evidence in the record, however, to suggest that Jones himself made any misrepresentations or otherwise engaged in any actual fraud in order to obtain the 2003 loan from the Bank. There is simply nothing in the record to suggest that the Bank made the loan with anything less than full knowledge of the risks it was taking.

Because the uncontradicted evidence established that the Bank was fully aware of all aspects of the 2003 loan transaction and the risks inherent therein, and because the Bank failed to present any evidence to establish that Strobach made any misrepresentations to the Bank to obtain the loan, we conclude there was not even a scintilla of evidence that Strobach used the JSF Corporation to perpetrate an actual fraud on the Bank in obtaining the 2003 loan. *See, e.g.*, *Metroplex Mailing Services, LLC v. RR Donnelley & Sons Co*., 410 S.W.3d 889, 897-98 (Tex.App. – Dallas 2013, no pet.) (where there was no evidence that defendant shareholder made any misrepresentations about the nature of the corporation's assets to induce the plaintiff to enter into contract with it, and there was no evidence that shareholder made any fraudulent transfers of corporate assets to defeat the plaintiff's ability to make a claim against the corporation, the trial court's judgment finding defendant shareholder personally liable for corporation's obligations was reversed on appeal); *see also Ocram, Inc. v. Bartosh,* No. 01-11-00793-CV, 2012 WL 4740859, at *3-5 (Tex.App. – Houston [1st Dist.] Oct. 4, 2012, no pet.) (mem. op.) (reversing trial court's judgment finding defendant shareholder personally liable for corporation's obligations where jury rejected the plaintiff's fraud claim, and the plaintiff presented no evidence suggesting that the defendant made any misrepresentations to the plaintiff); *Menetti*, 974 S.W.2d at 174 (reversing trial court's judgment finding corporation's owners personally liable, where there was no evidence that the owners made any false representations to the plaintiffs to induce them into signing contract); *Sanchez v. Mulvaney,* 274 S.W.3d 708, 712 (Tex.App. – San Antonio 2008, no pet.) (holding that trial court properly granted summary judgment in favor of defendant on plaintiff's claim seeking to hold defendant personally liable for the corporation's alleged breach of contract, where the plaintiff failed to present a scintilla of evidence to raise a genuine issue of fact that the

18

member used the corporation to perpetrate an actual fraud on the plaintiff).

### The Effect of Strobach's Failure to Maintain Corporate Formalities

The Bank focuses much of its attention on the fact that after obtaining the 2003 loan on the Corporation's behalf, Strobach admittedly failed to adhere to any corporate formalities. Among other things, the Bank points out that while Strobach testified she intended for the JSF Corporation to continue its operations after she formed it, she never called a board meeting, never opened a corporate checking account, never filed a corporate tax return, and never paid any franchise taxes, causing the Corporation's charter to be revoked in 2005.[10] The Bank argues this evidence established that Strobach created the JSF Corporation as a sham corporation, which she treated as her alter-ego for her own personal use, and that she had no intention of truly operating the corporation as a business, no intention of maintaining the corporate structure, and no intention of ensuring that the Corporation would honor its obligations to the Bank in repaying that loan. We disagree.

As discussed above, the Legislature has directed that in determining whether a corporate affiliate may be held personally liable for the corporation's obligations, a court may not consider whether a corporation's owner used a corporation as his alter-ego, or whether the owner failed to follow corporate formalities or other requirements of the Business Organizations Code in operating the corporation. TEX. BUS. ORGS. CODE ANN. § 21.223. Instead, the Legislature has made it clear that the only method to hold a corporate affiliate liable is to demonstrate that the affiliate used the corporation to perpetrate an actual fraud for the affiliate's personal benefit. TEX.

---

[10] While the Bank contends that Strobach also admitted that the Corporation never conducted any true business, as the Corporation's farm land was all in CRP status and therefore could not be farmed, Strobach explained that she considered the Corporation to be an ongoing farming business because the Corporation's land was generating income from the USDA payments, despite the Corporation's temporary inability to grow crops on the land.

19

BUS. ORGS. CODE ANN. § 21.224.   Therefore, we conclude that the evidence of Strobach's failure to maintain corporate formalities could not show that Strobach was personally liable to the Bank for the Corporation's loan obligations.   *See, e.g., Priddy*, 282 S.W.3d at 601 (trial court properly granted summary judgment in favor of defendant on issue of personal liability where the plaintiff focused solely on alter-ego theory, and failed to come forward with any competent summary judgment evidence to show that the defendant used the corporation to perpetrate an actual fraud for his own benefit as required by statute); *Menetti,* 974 S.W.2d at 175-76 (finding insufficient evidence to support jury's verdict imposing personal liability on corporation's shareholders, noting that although shareholders were shown to be "careless bookkeepers and perhaps enjoyed the tax advantages of living off their corporate funds with little effort to preserve the corporate fiction," there was no evidence presented to suggest that they made any misrepresentations to the plaintiffs or otherwise used the corporation to commit any actual fraud against the plaintiffs for their personal benefit).

Similarly, we reject the Bank's argument that the loss of the Corporation's charter in 2005 raised a fact issue that Strobach acted with actual fraud in 2003 when she obtained the loan from the Bank on the Corporation's behalf.   The Bank appears to believe that the loss of the Corporation's charter was not only a breach of the 2003 promissory note, which required the JSF Corporation to be "duly organized and validly existing in all jurisdictions" in which it was doing business, but also constituted evidence that Strobach never intended to maintain the corporation's status, and thereby never intended to ensure that the Corporation would meet its obligations to the Bank when she obtained the 2003 loan on the Corporation's behalf.

In this regard, the Bank primarily relies on the Dallas Court of Appeals opinion in *Latham*,

20

320 S.W.3d at 607. In *Latham*, the owners of a family-owned and operated roofing services corporation had allegedly provided shoddy services to the plaintiff. After unsuccessful attempts to resolve the parties' dispute, the plaintiff retained in attorney, who notified the corporation that it intended to make a claim for damages against it. Shortly thereafter, despite knowing of this potential claim, the corporation's owners formally dissolved the corporation and distributed the corporation's assets to themselves, without taking into account the plaintiff's claim. In addition, in their dissolution documents, the owners falsely represented that all known debts, liabilities, and obligations of the corporation had been satisfied or provided for prior to the distribution of the corporation's assets. *Id*. at 609. The court in *Latham* held that a rational juror could have decided that the owners' conduct in dissolving the corporation, without accounting for the plaintiff's known claim, "represented dishonesty of purpose or an intent to deceive, *i.e.,* actual fraud," and that the corporation's owners had used the corporation "as part of a basically unfair device to achieve an inequitable result," *i.e*., to deprive the plaintiff of being able to seek any recourse from the corporation for its claims. *Id.* at 609-10.

The Bank contends that the present case is factually similar to *Latham*, because it believes the evidence at trial demonstrated that Strobach acted with dishonesty of purpose when she failed to maintain the Corporation's charter, and that Strobach should therefore not be allowed to escape personal liability for her conduct, as doing so would produce an "unjust, inequitable outcome[.]" We disagree with the Bank's argument for several reasons.

First, unlike the situation in *Latham*, there was no evidence presented at trial that Strobach formally dissolved the JSF Corporation or that she otherwise fraudulently diverted any corporate assets to defeat the Bank's ability to collect on the loan. Instead, the only evidence at trial

established that Strobach allowed the Corporation's charter to be revoked due to her failure to pay the Corporation's franchise taxes. However, unlike a formal dissolution when the corporation ceases to legally exist and assets are distributed, when a charter is revoked for failure to pay such taxes, this in no way affects the legal existence of the Corporation. "A corporation does not cease to exist merely because its charter has been forfeited, so long as there is a statutory right to have the corporate charter reinstated"; instead, its legal existence is not extinguished until the corporation is formally dissolved. *Doucakis v. Speiser, Krause, Madole, P.C.,* No. 08-00-00296-CV, 2002 WL 1397155, at *5 (Tex.App. – El Paso June 27, 2002, pet. denied) (not designated for publication); *see also Hinkle v. Adams*, 74 S.W.3d 189, 193 (Tex.App. – Texarkana 2002, no pet.) (forfeiture of a corporate charter due to failure to pay franchise taxes does not extinguish the corporation as a legal entity so long as there is a statutory right to have the corporate charter reinstated). By statute, Strobach still had the right to pay her franchise taxes and have the corporate charter reinstated at any time. TEX. TAX CODE ANN. § 171.312 (West 2015) (corporation's charter may be reinstated upon the filing of reports by the corporation and the payment of any taxes, penalties and interest imposed). Therefore, the JSF Corporation still had a legal existence at the time the Bank found the Corporation's note to be in default.

More important, unlike the corporation's owners in *Latham*, Strobach never distributed any of the Corporation's assets to herself or anyone else. The Corporation retained ownership of the three tracts of land securing the Corporation's loan well after its charter was revoked in 2005, and the Bank continued to receive the CRP payments on the land for at least three years after the revocation took place, without any effort on Strobach's part to interfere with those payments. The Corporation lost ownership of the land, which in turn caused the Corporation's loan to become

22

insecure, not because of the charter revocation or because any action or inaction on Strobach's part. Instead, the loan became insecure solely because Jones defaulted on his loans, which led to the Bank's 2008 foreclosure sale, which in turn ultimately extinguished the 2003 deed of trust that had been securing the Corporation's 2003 loan, causing the Bank to declare the Corporation's loan in default. The Bank here failed to present even a scintilla of evidence that Strobach engaged in any action that fraudulently resulted in the Bank's inability to collect on the Corporation's 2003 loan. *See generally Metroplex Mailing Servs., LLC*, 410 S.W.3d at 897-98 (rejecting appellant's argument that corporation's owner could be held liable for the corporate obligations, where the evidence failed to demonstrate that he fraudulently diverted corporate assets for his own benefit as claimed by the plaintiff).[11] We overrule the Bank's sole issue on appeal.

## CONCLUSION

The record fails to contain a scintilla of evidence that Strobach utilized the JSF Corporation to perpetrate an actual fraud on the Bank for her own direct personal benefit. We therefore conclude the trial court did not err in granting Strobach's motion for directed verdict and in

---

[11] Even if there were sufficient evidence that Strobach engaged in actual fraud, the Bank failed to produce any evidence that Strobach received a direct personal benefit from the transaction. Any "sentimental value" the Bank argues Strobach received from forming and operating the Corporation would be insufficient to sustain a finding of a direct personal benefit as required by the Texas Business Organization Code. The benefits received must relate to the allegedly fraudulent transaction itself, rather than to the more general personal benefits that a defendant may have received from forming or otherwise generally using a corporation. *See, e.g., Menetti,* 974 S.W.2d at 175; *Rutherford v. Atwood,* No. 01-00-00113-CV, 2003 WL 22053687, at *4-5 (Tex.App.—Houston [1st Dist.] Aug. 29, 2003, no pet.) (mem. op.). Likewise, even if the loan proceeds were used to benefit one of the corporations owned by Strobach or her father, this would not support a finding that Strobach herself received any direct personal benefit from this use. Benefits to the corporation itself from the use of funds fraudulently obtained does not, standing alone, suggest any personal benefit from the funds. *See, e.g., Solutioneers Consulting, Ltd.,* 237 S.W.3d at 388-89 (shareholder could not be held personally liable for corporation's obligations, where the evidence established that the funds fraudulently obtained by corporate shareholder only benefitted the corporation itself, and there was no evidence that the defendant used the funds to purchase personal items or to pay personal debts). Further, we reject the Bank's contention that Strobach received a direct personal benefit by allegedly utilizing the loan proceeds to pay off her father's personal debts. The Bank acknowledged that Strobach had no personal liability for any of her father's debts. Strobach's actions could not have divested her of a liability that did not exist in the first place. And, there was no evidence that Strobach derived a personal benefit by delaying foreclosure, because there was no evidence that any of Jones's loans had been declared in default at the time the Bank made the 2003 loan to the JSF Corporation.

entering a take-nothing judgment.   Accordingly, we affirm the trial court's judgment.


STEVEN L. HUGHES, Justice

March 23, 2016

Before McClure, C.J., Rodriguez, and Hughes, JJ.